**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, *Plaintiff-Appellee*, v. WORLD CAPITAL MARKET, INC.; WCM777 INC.; WCM777 LTD., DBA WCM777 Enterprises, Inc.; MING XU, AKA Phil Ming Xu, *Defendants*, and VINCENT J. MESSINA, Relief Defendant; INTERNATIONAL MARKET VENTURES, Relief Defendant, *Defendants-Appellants*. | No. 15-55325 D.C. No. 2:14-cv-02334- JFW-MRW OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted January 10, 2017
Pasadena, California

Filed March 21, 2017

Before: Richard C. Tallman and Michelle T. Friedland, Circuit Judges, and David A. Faber,[*] District Judge.

Opinion by Judge Tallman

**SUMMARY[**]**

**Securities and Exchange Commission / Disgorgement**

The panel affirmed the district court's final judgment as to appellants Vincent J. Messina and International Market Ventures, who contested their liability as "relief defendants" arising from the Securities and Exchange Commission's ("SEC") enforcement action against Phil Ming Xu and Xu-related entities for federal securities law violations arising out of a fraudulent investment scheme.

The SEC file a motion for an order of disgorgement against appellants, alleging they received $5 million of the tens of millions of dollars Xu unlawfully raised through investor deposits worldwide. Appellants alleged that they received those funds as a loan.

The panel held that the district court properly asserted jurisdiction over appellants as relief defendants to determine the legal and factual legitimacy of appellants' claim to the $5

[*] The Honorable David A. Faber, United States District Judge for the Southern District of West Virginia, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

million. The panel held that the SEC made the required showing that: (1) appellants received ill-gotten gains; and (2) appellants did not have a legitimate claim to those funds. The panel rejected appellants' contention that once they advanced a facially colorable claim to the disputed funds as loan proceeds, the court was immediately divested of jurisdiction to adjudicate the legitimacy of their claim.

The panel held that the district court did not clearly err in finding that the $5 million transfer from Xu to Messina as a loan was a sham. The panel also held that the record amply supported the district court's conclusion that the funds transferred to Messina and International Market Ventures were ill gotten as a matter of law. The panel further held that the district court did not err in holding International Market Ventures jointly liable for the portion of those ill-gotten funds that it received.

The panel rejected appellants' procedural challenges to the manner in which the district court adjudicated the disgorgement proceedings. The panel also held that appellants were afforded sufficient due process during the relief defendant proceedings before the district court.

---

## COUNSEL

Maranda E. Fritz (argued) and Tammy P. Bieber, Thompson Hine LLP, New York, New York, for Defendants-Appellants.

Daniel Staroselsky (argued), Senior Counsel; Randall W. Quinn, Assistant Attorney General; Jacob H. Stillman, Solicitor; Michael A. Conley, Deputy General Counsel; Anne

K. Small, General Counsel; Securities and Exchange Commission, Washington, D.C.; for Plaintiff-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

We address an issue of first impression involving the Securities and Exchange Commission's ability to disgorge ill-gotten funds from so-called "relief defendants." Victor Messina and International Market Ventures ("IMV"), contest their liability as relief defendants in the SEC's enforcement action against Phil Ming Xu and various Xu-related entities for federal securities law violations arising out of a fraudulent investment scheme. The SEC claims that Messina and IMV received $5 million of the tens of millions of dollars Xu unlawfully raised through investor deposits worldwide, but Messina and IMV assert that they received those funds as a loan.

The question presented is whether putative relief defendants may divest a district court of jurisdiction to proceed against them using summary procedures simply by asserting a claim of entitlement to the disputed funds in their possession. Messina and IMV argue that a facially colorable claim is sufficient to destroy relief defendant jurisdiction, and that to seek disgorgement from them, due process requires the SEC either to join them as party defendants or bring a separate action against them. Messina and IMV also argue that the SEC failed to show that the funds the district court ordered disgorged are proceeds of monies unlawfully collected from United States investors.

We conclude the district court properly exercised its jurisdiction to determine the legal and factual legitimacy of Messina and IMV's claim to the $5 million. The court acted correctly under our precedent approving the invocation of relief defendant procedures in SEC enforcement actions and did not clearly err in finding, following a two-day evidentiary hearing, that Messina and IMV had no legitimate claim to the funds. The evidence demonstrates that far more than $5 million was raised by Xu and his various entities in the United States, and the court correctly concluded that the funds sought were proceeds of illegal activity and subject to disgorgement. Finally, the district court did not abuse its discretion in later ordering disgorgement from Messina and IMV as relief defendants. We have jurisdiction and affirm.

# I

Phil Ming Xu, together with his corporations including World Capital Market, Inc., WCM777 Inc., and WCM777 Ltd. (collectively, "WCM"), ran a multi-level marketing business ostensibly selling investors membership units providing access to cloud computing services. Xu and WCM promised investors returns of up to 60 percent over a 100-day period. WCM did not provide any actual products or services and had no significant legitimate revenue-generating business operations. Instead, Xu and WCM used money from new investors to pay existing investors and to buy real property and golf courses for Xu and associated third parties. Forensic accountants established that investor funds deposited into various Xu- and WCM-affiliated bank accounts between January 2013 and March 2014 totaled $57,175,385. Xu was

the mastermind who controlled the Ponzi scheme.[1] He later stipulated to liability for securities law violations, and judgment in favor of the SEC was ultimately entered against Xu in the amount of $57,260,683.88.

Relief defendant Vincent Messina began working with Xu in June 2013, providing legal advice regarding tax, corporate, and immigration matters. During this time, Messina was also general counsel to relief defendant IMV in Washington, D.C. IMV's President, Gary Messina, is Vincent Messina's nephew.[2]

By the fall of 2013, Messina was well aware that Xu and WCM were under investigation by the SEC for securities law violations. Xu instructed WCM's chief operating officer to keep Messina apprised of the Commission's investigation "so that Mr. Messina could help Mr. Xu protect his assets." On December 17, 2013, WCM disbursed $200,000 to Messina, who deposited it into a lawyers trust account at Wells Fargo Bank. Although no contract reflects the purpose of this transfer, according to Messina the funds represented fees for his services related to the formation of a political action

---

[1] The term "Ponzi scheme" originates from a fraudulent investment scheme created by Charles Ponzi in December 1919 in Boston. *See Cunningham v. Brown*, 265 U.S. 1, 7 (1924). The SEC defines a Ponzi scheme as "an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors." *Fast Answers – Ponzi Schemes*, U.S. Securities and Exchange Commission, http://www.sec.gov/answers/ponzi.htm (last visited Mar. 14, 2017).

[2] To avoid confusion, we refer to Gary Messina by his full name and to Vincent Messina as "Messina."

committee ("PAC") requested by Xu.**[3]**  Messina signed a
Consulting Contract with IMV on January 10, 2014, retaining
Gary Messina and IMV to assist with work related to the
formation of the PAC.  The fees for IMV's services were
listed as "Two Hundred Thousand Dollars consisting of two
payments:  (1) One Hundred Thousand Dollars upon the
execution of this agreement and (2) One Hundred Thousand
Dollars on June 1st 2014."  No money was transferred to
IMV on the date of the execution of the agreement.

By February 2014, Xu's outside securities law counsel,
Scott Warren, was in settlement discussions with the SEC on
behalf of Xu and WCM.  Messina, learning that Warren had
recommended settling with the SEC for $64 million, texted
Xu on February 6, 2014, advising him to "drop Scott"
because the proposed settlement sum was "ridiculous."
Messina also wrote:

> By the way the SEC does not have the power
> to bring a criminal charge.  That is the
> decision of the US Attorney which is entirely
> separate from the SEC.  Perhaps the new
> counsel can delay the negotiations so that
> your assets seem less.  I have tried to look at
> your transactions from the standpoint of
> rearranging them, but have not been able to
> get the required information.

---

**[3]** An undated Statement of Account provided by Messina lists
$121,800 due and owing for his work related to Xu's PAC.  Messina has
not explained why he commingled $200,000 in earned fees by depositing
the funds into a trust account, typically employed to hold client funds to
cover future legal work.

Xu responded:  "Ok."

Three weeks after this text exchange, Xu transferred $5 million from the bank account of ToPacific Inc. (another Xu entity funded by WCM investor deposits) into Messina's Bank of America attorney-client trust account.  Xu was ToPacific Inc.'s sole director and the signatory on its bank account.  Xu asked Messina to hold the funds for future business endeavors.  Messina responded that he would not simply hold the funds, and instead prepared and executed a document Messina characterizes as a loan agreement the day after the transfer which, in its entirety, reads:

> This Agreement ("Agreement") is entered into on February 27, 2014, between Vincent J. Messina and Ming Xu.
>
> **FOR VALUE RECEIVED**, Vincent J. Messina promises to pay to Ming Xu without recourse the sum of Five Million Dollars ($5,000,000) with interest computed at five percent (5%) per annum, interest and principal due on January 2, 2019 at his place of business.

That transfer from Xu to Messina was recorded as an "uncategorized expense" in ToPacific's books and a payee was not specified.  Messina testified before the district court that the loan was in furtherance of previously discussed proposals to set up a fund for future investments in Africa, the "no recourse" language in the agreement meant that he could do whatever he wanted with the money in terms of investment ventures, and he had no personal legal obligation to repay Xu, although he had a "moral obligation" to do so.

Nine days after Xu transferred the $5 million to Messina, Xu sent a text message to him requesting the return of the money to help fund a settlement with the SEC. Messina refused, stating: "The money has already been wired out and is i[n] accordance with the note I signed." In actuality, as of March 6, 2014—when Xu requested the recall of funds— Messina still held almost all of the $5 million in a series of personal and client trust accounts and had transferred only $125,000 to IMV and $100,000 to Mohammed el Fatih Saeed, who was in charge of IMV's correspondent office in the United Arab Emirates. Despite Xu's request, Messina went on to use seven different bank accounts to distribute approximately $3 million of the funds to various business partners and associates. Relevant here are Messina's additional transfers of $125,000 to IMV on March 10, 2014; $350,000 on March 24, 2014; and $400,000 on March 29, 2014.

According to Gary Messina's testimony, $100,000 of the close to $1 million IMV received from Messina during this time represented fees for IMV's services under the January 2014 PAC Consulting Agreement and the remainder "related to a potential business venture that would be undertaken as part of an agreement with CNC Consulting."[4] On April 1, 2014, acting on instructions from Messina, Gary Messina wired $840,485 of the funds to a bank account in Canada maintained by Andrew Savor. Gary Messina testified that Savor was the agent for CNC Consulting in Canada.

---

[4] CNC Consulting was another entity affiliated with IMV and WCM—in this case through Scott Choi, a senior vice president at IMV who was slated to run WCM's operations in Hong Kong.

Meanwhile, the SEC initiated enforcement proceedings against Xu and WCM in Los Angeles district court. On March 27, 2014, the Commission filed its complaint against Xu and WCM, and the court appointed a statutory receiver and issued a temporary restraining order freezing all of Xu's and WCM's assets and accounts (including ToPacific's accounts). After discovering Xu's February 26 transfer of $5 million to Messina, the receiver contacted Messina on March 30 and provided him with a copy of the temporary restraining order. Subsequent negotiations between Messina's attorney at Thompson Hine LLP, the receiver, and the SEC resulted in Messina's transfer of the approximately $2 million remaining from the funds he had received from Xu to Thompson Hine's client trust account to hold in escrow pending further order of the court. Gary Messina also wired $100,000 of Xu's funds to Thompson Hine's trust account.

The SEC amended its complaint against Xu and WCM on May 7, 2014, adding Messina and IMV as relief defendants. On May 21, the district court ordered Messina and IMV's assets frozen and authorized expedited discovery. Messina and IMV filed a motion to dismiss on June 2, 2014, arguing they were not proper relief defendants because they had a legitimate claim to the $5 million they received from Xu. The district court denied the motion to dismiss on July 10, but ordered a Rule 12(b)(1) evidentiary hearing to resolve disputed issues of fact related to the legitimacy of Messina and IMV's claims to the funds. On July 30, 2014, Xu separately consented to the entry of judgment against him and

disgorgement and a civil penalty in an amount to be determined by the court upon motion by the SEC.**⁵**

Following expedited discovery, the district court held its Rule 12(b)(1) evidentiary hearing on September 5 and 17, 2014, during which it heard testimony from six witnesses, including Vincent and Gary Messina. One hundred thirty-eight exhibits offered by the SEC and twenty-five exhibits offered by the relief defendants were admitted into evidence. The district court made an adverse credibility finding against Vincent Messina, noting that his testimony seemed "contrived and evasive" and that his "long, rambling, non-responsive answers to simple, straightforward questions were designed to avoid directly answering questions that would be harmful to his position." Ultimately, the court concluded after listening to the witness that it was left "with the distinct impression that Vincent Messina was prepared to say whatever he deemed necessary in an attempt to hold on to the $5 million." The court ruled that Messina had no legitimate claim to the $5 million because the loan agreement with Xu was a sham and that IMV likewise had no legitimate claim to $941,505 of the $1,050,000 it received from Messina. The court also concluded, however, that the SEC had failed to carry its burden to demonstrate Messina and IMV were not entitled, respectively, to $200,000 and $108,495 for their work related to Xu's requested PAC.

---

**⁵** The district court entered final judgment against Xu on December 6, 2016, in the amount of $57,260,683.88, from which any sums ultimately disgorged from Messina and IMV as relief defendants were to be deducted. Xu did not appear in court to contest the amount of judgment. The district court entered final judgment against WCM on November 23, 2016, in the amount of $87,793,384.02.

On January 12, 2015, the SEC filed a motion for an order of disgorgement against Messina and IMV.  After full briefing, the district court granted the motion without further hearing on February 4, 2015, and ordered Messina to disgorge $5 million, with IMV jointly liable for $941,505 of that amount.  Final judgment against Messina and IMV was entered on February 20, 2015, and they timely appealed.  We have jurisdiction under 28 U.S.C. § 1291.

## II

Messina and IMV's primary contention on appeal is that the district court lacked subject matter jurisdiction to determine the legitimacy of their claim to the $5 million Messina received from Xu.  They also argue the district court erred in its factual findings, improperly ordered disgorgement, and denied them due process.

We review a district court's exercise of subject matter jurisdiction over relief defendants de novo.  *See SEC v. Colello*, 139 F.3d 674, 675 (9th Cir. 1998).  We review the district court's underlying factual findings on jurisdictional issues, however, for clear error.  *See United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1126–27 (9th Cir. 2015) (en banc) ("Where the district court relied on findings of fact to draw its conclusions about subject-matter jurisdiction, we review those factual findings for clear error."); *see also Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002) (reviewing for clear error factual findings entered after a hearing to determine the legitimacy of a relief defendant's claim to the disputed funds).

Generally, a district court's decision to award disgorgement is reviewed for abuse of discretion. *Colello*, 139 F.3d at 675. The court's order of disgorgement in this case, however, resulted in part from its conclusion that the undisputed forensic evidence tracing the investor money demonstrated as a matter of law that the funds Xu transferred to Messina were ill gotten. We review that conclusion de novo because it involves the application of law to facts not disputed at the hearing.[6] *Id.*

## III

The SEC is authorized by both the Securities Act of 1933 and the Securities Exchange Act of 1934 to bring civil enforcement actions seeking equitable relief in the form of injunctions against those committing violations of the Acts. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1). In such actions, federal courts may grant "any equitable relief that may be appropriate or necessary for the benefit of investors," 15 U.S.C. § 78u(d)(5), including disgorgement of the gains obtained from securities law violations. *See, e.g.*, *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010). Courts may also exercise their broad equitable powers to order disgorgement from non-violating third parties who have received proceeds of others' violations to which the third parties have no legitimate claim. In such circumstances, these non-violating third parties are referred to as "relief defendants" or "nominal defendants." *Colello*, 139 F.3d at 676.

---

[6] Consistent with that approach, the district court treated the SEC's motion for disgorgement as one for summary judgment, and the parties agree that this court accordingly should review the resulting order de novo. *See id.*

In the context of an SEC enforcement action, a relief defendant "is a person who 'holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute.'" *Id.* (quoting *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991)). Accordingly, a relief defendant is "not a real party in interest," *id.*, and "can be joined to aid the recovery of relief without the assertion of subject matter jurisdiction" because he or she "has no ownership interest in the property which is the subject of litigation," *Cherif*, 933 F.2d at 414. As we have previously recognized, "the paradigmatic example of a nominal defendant is 'a bank or trustee [that] has only a custodial claim to the property,'" however "the term is broad enough to encompass persons who are in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in the underlying securities enforcement action." *SEC v. Ross*, 504 F.3d 1130, 1141 (9th Cir. 2007) (quoting *Colello*, 139 F.3d at 677).

To assert jurisdiction over—and ultimately obtain disgorgement from—Messina and IMV as relief defendants, the SEC was required to demonstrate that Messina and IMV (1) received ill-gotten funds and (2) do not have a legitimate claim to those funds. *Colello*, 139 F.3d at 677. We agree with the district court that the SEC made both of the required showings in this case and we hold that asserting jurisdiction over Messina and IMV as relief defendants was proper.

**A**

Messina and IMV contend that once they advanced a facially colorable claim to the disputed funds as loan proceeds, the district court was immediately divested of jurisdiction to adjudicate the legitimacy of their claim and

proceed any further against them as relief defendants. They insist they would have to be named as defendants either in the SEC's underlying civil enforcement action against Xu and the Xu-related entities or in a stand-alone lawsuit, with all of the rights attending a civil action. We disagree.

Messina and IMV filed a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, challenging the factual predicate for the court's relief-defendant jurisdiction—namely, the legitimacy of their claim to the $5 million received from Xu. In adjudicating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), "if the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself." *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014). We see no reason to treat a factual dispute any differently in the context of a relief defendant proceeding. We therefore conclude that the district court properly conducted a Rule 12(b)(1) evidentiary hearing to evaluate the legitimacy of Messina and IMV's claims to the funds at issue.

In Messina's contrary view, the putative loan agreement gave him "presumptive title" to the money and the receiver therefore could not proceed against him as a relief defendant; rather, the receiver could disgorge the $5 million only by demonstrating that Messina himself had violated the securities laws. *See Ross*, 504 F.3d at 1142. But this position begs the question because it necessarily assumes the loan was not a sham—the very issue the district court resolved in the Rule 12(b)(1) hearing in deciding whether to allow the proceedings against Messina and IMV as relief defendants to continue. *See Colello*, 139 F.3d at 677 ("[T]he lack of a legitimate claim to the funds is the defining element of a nominal defendant."). Relief defendants cannot defeat

jurisdiction simply by asserting an ownership interest in the disputed funds; rather, as the Fourth Circuit has explained, they must assert an interest both "recognized in law" and "valid in fact." *Kimberlynn Creek Ranch, Inc.*, 276 F.3d at 192 (rejecting relief defendant's ownership claim as "not factually valid"). We join the Fourth Circuit in so holding. Otherwise, any third party with a custodial claim to the proceeds of securities violations committed by others would be able to defeat relief defendant jurisdiction "simply by stating a claim of ownership, however specious." *Id.*

Our holding in *Ross* does not compel a different conclusion. In that case, it was undisputed that the purported relief defendant, a salesman for the company accused of violating securities laws, received funds in the form of commissions on his sales of unregistered securities—that is, "he received compensation in return for services rendered." 504 F.3d at 1142. We recognized that the salesman had presumptive title to the funds just as "any other employee or vendor," and it was on that basis that we reversed the district court's exercise of jurisdiction over him as a relief defendant. *Id.* Here, by contrast, the facts demonstrating presumptive title are disputed; indeed, whether the $5 million Messina received represented the proceeds of a valid loan or was instead an attempt to make Xu's assets "seem less" was hotly contested. Messina and IMV's reliance on *U.S. Commodity Futures Trading Commission v. WeCorp, Inc.*, 848 F. Supp. 2d 1195 (D. Haw. 2012), is similarly misplaced. In *WeCorp*, the district court found an attorney had a legitimate claim to funds received following the circulation of an email offering legal services because the undisputed evidence demonstrated the attorney had actually performed work in exchange for the payment. *See id.* at 1201–03. No such undisputed evidence is present here.

Nor are we persuaded by the cases Messina and IMV cite to support their argument that the purported existence of a loan agreement, without more, is sufficient to establish presumptive title and destroy relief defendant jurisdiction. Those cases are inapposite because, just as in *Ross* and *WeCorp*, each rests on an undisputed underlying factual premise of legitimacy missing in this case. In *SEC v. Founding Partners Capital Management*, for example, it was "undisputed that [the purported relief defendant] received the loan proceeds pursuant to written loan agreements" establishing a valid debtor-creditor relationship executed eight years prior to the SEC enforcement action. 639 F. Supp. 2d 1291, 1294 (M.D. Fla. 2009). Similarly, in *Janvey v. Adams*, it was "undisputed that the [purported relief defendants] received the [funds] pursuant to written certificate of deposit agreements . . . well before the underlying SEC enforcement action." 588 F.3d 831, 834–35 (5th Cir. 2009).

Here, the relevant facts were disputed; the district court received extensive documentary evidence and heard considerable testimony regarding Messina's dealings with Xu, WCM, and IMV, including evidence about the creation of the disputed loan agreement, and ultimately determined that Messina's ownership claim was not factually valid—i.e., it was not a legitimate loan upon which to base a cognizable claim. To conclude that the district court lacks jurisdiction to engage in such factfinding after the mere invocation of a claim of entitlement to the funds would effectively eliminate the relief defendant procedure in SEC enforcement actions in any case involving a disputed claim to funds alleged to be the proceeds of securities fraud. We decline to take such a step, and hold that the district court appropriately adjudicated the legal and factual validity of Messina and IMV's claim to the

$5 million to determine whether it had jurisdiction over them as relief defendants.

## B

Having concluded that it was proper for the district court to adjudicate the legitimacy of Messina and IMV's claim, we next hold that there was no clear error in the district court's finding that the $5 million transfer from Xu to Messina as a loan was a sham. Over the course of a two-day evidentiary hearing, the court assessed more than 150 exhibits and heard testimony from six witnesses, including Vincent Messina and Gary Messina, whose credibility the court was in the unique position to evaluate. *See Valenzuela v. Michel*, 736 F.3d 1173, 1176 (9th Cir. 2013) (noting that where findings of fact turn on credibility determinations, "the findings receive heightened deference in light of the fact finder's unique opportunity to observe the demeanor of the witnesses" (internal quotation marks omitted)). We will not disturb the district court's factual findings absent a "definite and firm conviction that a mistake has been committed." *McClure v. Thompson*, 323 F.3d 1233, 1240 (9th Cir. 2003). Our review of the record yields no such conviction.

In concluding the loan agreement was a ruse designed to keep $5 million of Xu's money out of the reach of the SEC, the district court relied not just on its rejection of Messina's incredible testimony, but also on impeaching evidence such as: Messina's text message to Xu advising him to delay the SEC negotiations so that they could make his assets "seem less"; Xu's transfer of the $5 million less than three weeks later, before any discussion of a potential loan, along with a contemporaneous request for Messina to "hold" the money; the cursory agreement prepared by Messina after the transfer,

which lacked the normal provisions of a valid loan agreement; ToPacific's record of the transfer as an "uncategorized expense" without a listed payee; the agreement's promise to repay Xu rather than ToPacific; Messina's testimony that he had no personal legal obligation to repay the $5 million; and Xu's request to Messina to return the $5 million just nine days after the transfer. The court did not clearly err in evaluating this evidence and, accordingly, we affirm its finding that the loan transaction was a sham.

## C

In its February 4, 2015, disgorgement order, the district court concluded that the $5 million transferred from Xu to Messina and the $941,505 Messina subsequently transferred to IMV were ill gotten as a matter of law. We affirm because the unrebutted forensic analysis traced the source of the transferred funds. There was no error in the court's ultimate conclusion that the monies were the proceeds of unlawful activity or that IMV should be held jointly liable for the $941,505 of those funds it received.

The SEC provided unrebutted declarations from the receiver and the SEC accountant responsible for the Commission's forensic accounting investigation showing that the only significant source of funds in Xu and WCM's bank accounts, including the ToPacific account from which funds were transferred to Messina and then on to IMV, were proceeds from Xu and WCM's fraudulent investment scheme. For example, the SEC accountant's sworn declaration filed on August 22, 2014, describing her work in tracing the deposits of investor funds and transfers between Xu and WCM accounts, supported her conclusion that the records showed no "appreciable source of revenue other than apparent

payments from investors in the WCM777 offerings." Likewise, the receiver swore in her August 22, 2014, declaration that she had found no evidence that "the Receivership Entities had any actual revenue-generating business operations related to the WCM777 or ToPacific programs, other than the pyramid-like scheme for raising money."[7]

Messina and IMV did not offer any evidence to controvert the SEC's analysis of Xu's and Messina's bank accounts, nor did they proffer any evidence potentially available to them through additional discovery that could raise a triable issue of fact regarding the source of the funds ultimately transferred to Messina and IMV. Although they now argue the receiver's final forensic accounting report filed on February 27, 2015, was not available to them before the district court entered its order of disgorgement, Messina and IMV point to no information in the final report that creates a triable issue of fact questioning the source of the funds. Indeed, that report largely restates the earlier information provided to the district court in the receiver's numerous interim reports, and in the receiver and SEC accountant's pre-hearing declarations and live testimony during the evidentiary hearing. That record amply supports the district court's conclusion that the funds transferred to Messina and IMV were ill gotten as a matter of law.

---

[7] Similar evidence was presented in an earlier declaration by the SEC accountant filed on March 31, 2014, which detailed her analysis of Xu and WCM accounts in support of the SEC's application for a preliminary injunction. The SEC also filed a second declaration by the receiver in support of its motion for an order of disgorgement on January 12, 2015, in which the receiver confirmed her prior findings regarding the source of the funds in the Xu and WCM accounts and provided additional supporting information characterizing the money in the ToPacific account.

The district court likewise did not err in holding IMV jointly liable for the portion of those ill-gotten funds that it received. The relief defendants argue that IMV neither possesses nor benefitted from the funds it received and subsequently transferred, and that it therefore should not be subject to the disgorgement order. The district court was free to reject this argument because ongoing possession of the funds is not required for disgorgement. *See Platforms Wireless*, 617 F.3d at 1098 ("A person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained."); *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1116 (9th Cir. 2006) ("The manner in which [the recipient of ill-gotten funds] chose to spend the illegally obtained funds has no relevance to the disgorgement calculation."); *see also Colello*, 139 F.3d at 677 (approving the use of relief defendant procedures even where the disputed funds were "paid over to others" by the relief defendant after their receipt). The district court also found that the equities weigh in favor of holding IMV jointly liable because Gary Messina willingly dissipated the funds despite knowing they were the subject of an ongoing SEC investigation and a dispute between Messina and Xu. The evidence—including the evidence showing the extent to which IMV was intertwined with Xu, WCM, and Messina—substantially supports the district court's conclusion.

## IV

In addition to contesting the amount of disgorgement ordered by the district court, Messina and IMV also mount a series of procedural challenges to the manner in which the district court adjudicated the disgorgement proceedings. Essentially, Messina and IMV argue that the district court

abused its discretion by refusing to extend the briefing schedule or to adjourn its ruling until after the receiver's final report was issued. They argue that as a result, the district court did not yet know the total amount of the fraud, the amount of fraudulent gains outstanding, or the amount over which the SEC would ultimately be able to establish territorial jurisdiction.

First, we reject Messina and IMV's argument that the district court erred in ordering disgorgement from them as relief defendants before entry of a final judgment of the total amount to be disgorged by Xu. They point to no authority in support of their argument and, regardless, ignore the wealth of undisputed evidence available to the district court demonstrating that close to $60 million of investor funds were collected as "deposits into the United States dollar portion of" the Xu and WCM bank accounts as a result of Xu's scheme. Xu had already consented to entry of judgment against him for his alleged securities violations, and all that remained was for the district court to determine the total amount of the investor funds Xu would be ordered to disgorge.[8] Once the district court found that Messina and IMV were proper relief defendants, it was not an abuse of discretion to order them to disgorge this small fraction of these proceeds.

---

[8] That number ultimately was fixed at $57,260,683.88. To the extent the relief defendants are concerned with the potential for double recovery by the SEC, that concern is assuaged by the district court's provision that "Xu shall receive a credit for any sums paid by [the relief defendants] on their disgorgement and/or prejudgment interest obligations."

Nor did the district court err in rejecting the relief defendants' related extra-territoriality argument.[9]  Messina and IMV assert that under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), applies only to domestic transactions, and that the district court did not know at the time it entered the order of disgorgement against the relief defendants what percentage of Xu's ill-gotten funds derived from securities transactions in the United States.[10]  Even assuming that the SEC can only seek disgorgement of funds related to domestic securities transactions, the undisputed evidence here shows that far more than $5 million in investor transactions took place in the United States.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (explaining that under *Morrison*, "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States

---

[9] Given that relief defendants are not real parties in interest, *Ross*, 504 F.3d at 1141, it is not apparent that a relief defendant would have standing to challenge generally the SEC's territorial jurisdiction over the funds at issue in the underlying enforcement action.  But Messina and IMV frame their extra-territoriality argument as a complaint about the manner in which the district court handled the disgorgement proceedings against them.  Specifically, they argued that the district court abused its discretion by ordering disgorgement before the receiver's final report issued because the court had not yet determined the total amount of ill-gotten gains at issue in the underlying SEC action.  We address the argument in that posture.

[10] The SEC argues in response that Congress overrode the *Morrison* decision when it enacted Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376.  The SEC did not raise this argument below, and we need not address it here.  *See Arduini v. Hart*, 774 F.3d 622, 634 n.12 (9th Cir. 2014) ("We generally do not consider issues raised for the first time on appeal.").

or when title is passed within the United States").[11] Accordingly, the district court properly exercised its discretion in ordering the relief defendants to disgorge the $5 million they had received from Xu. We therefore affirm the disgorgement order in its entirety.

## V

Messina and IMV were afforded sufficient due process during the relief defendant proceedings before the district court. Our precedent recognizes "a truncated form of process vis-à-vis" relief defendants. *Ross*, 504 F.3d at 1141. No less importantly, the process afforded Messina and IMV here was substantial. Messina was contacted by the receiver on April 1, 2014—just four days after the SEC filed its case against Xu and WCM—and Messina, represented by counsel, entered into negotiations with the receiver and the SEC over the next few days that resulted in his deposit of the remaining contested funds into escrow. Messina therefore had notice of the underlying action against Xu and WCM almost immediately and cannot claim he was unaware of his own potential liability by April 2014. Messina and IMV were formally named by the SEC as relief defendants and served with the First Amended Complaint a month later. They were granted expedited discovery, and they participated fully in the Rule 12(b)(1) evidentiary hearing, where they were represented by able counsel, and where they testified,

---

[11] We have yet to address what constitutes a domestic transaction under *Morrison*, but the Second Circuit's analysis of this issue in *Ficeto* is instructive. Given the undisputed evidence regarding the scale and scope of Xu and WCM's operations in the United States, we consider it beyond peradventure that far in excess of $5 million was raised via domestic transactions under any reasonable interpretation of *Morrison*.

examined witnesses, and offered documentary evidence.  We hold that Messina and IMV were provided a constitutionally sufficient opportunity to litigate their rights.

Messina and IMV again point to their late receipt of the receiver's forensic accounting report as proof that the proceedings were unfair.  Again, we disagree.  Even if it was error to enter the disgorgement order before the final forensic report issued, Messina and IMV have not explained how they were prejudiced by that error.  Throughout the proceedings before the district court, Messina and IMV had unfettered access to the receiver's numerous interim reports as well as the receiver and SEC accountant's detailed declarations and testimony.  The final forensic accounting report largely restates and further corroborates the previously disclosed interim conclusions demonstrating the existence and functioning of a large and successful Ponzi scheme orchestrated by Xu.  Moreover, we see no exculpatory information helpful to the relief defendants' position in the final report, nor have relief defendants identified anything in the report that would have materially assisted their positions during the evidentiary hearing or in resisting disgorgement.  As the district court correctly noted, the relief defendants "had more than an adequate opportunity to conduct discovery" and "failed to identify the particular facts [] they reasonably expect[ed] to obtain with further discovery, or explain why those facts would preclude granting the SEC's Motion for Order of Disgorgement."  On the facts before us, we hold the relief defendants were provided adequate due process to litigate their claims.

**VI**

The Final Judgment as to relief defendants Vincent J. Messina and International Market Ventures is **AFFIRMED.** Costs on appeal are awarded to the Securities and Exchange Commission.