**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**December 16, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

     Plaintiff - Appellee,

v.

SONYA D. CAMARCO,

     Defendant,

CAMARCO LIVING TRUST; PAUL
CAMARCO,

     Relief Defendants - Appellants,

and

CAMARCO INVESTMENTS, INC., a/k/a
C Investments,

     Relief Defendant.

No. 19-1486
(D.C. No. 1:17-CV-02027-RBJ)
(D. Colorado)

_____

### ORDER AND JUDGMENT[*]

_____

Before **BACHARACH**, **EBEL**, and **McHUGH**, Circuit Judges.

_____

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

This appeal asks us to determine the extent to which a husband and a family trust must disgorge the benefits of a wife's fraudulent activities. Sonya Camarco ("Sonya")[1] worked as a financial advisor for LPL Financial, embezzling over $2 million in client funds between 2004 and August 2017. Over the course of those years, Sonya deposited client funds into her personal accounts and an account belonging to Camarco Investments, Inc. ("CI"). From her and CI's accounts, Sonya dispersed money to the Camarco Living Trust ("CLT"), financed the purchases of real properties that were eventually titled to CLT, and purchased furniture, artwork, and home improvement items for the real properties. Sonya also used funds from the accounts to purchase vacations for herself and her husband, Paul Camarco ("Paul").

In August 2017, the Securities and Exchange Commission ("SEC") commenced this disgorgement action against Sonya, CI, CLT, and Paul. The statute of limitations permitted the SEC to seek disgorgement of funds taken by Sonya during the five years prior to commencement of this action. After holding a remedies hearing at which Michael Hennigan testified as an accounting expert on behalf of the SEC, the district court ordered Paul to pay $109,927.95. The district court also ordered CLT to pay $865,000.00 in disgorgement, for which it was jointly and severally liable with Sonya. Further, the district court ordered the sale of the furnishings and artwork, but it did not credit the sale price of those items to the disgorgement amount owed by CLT. Additionally, the district court's order made

---

[1] Because Sonya shares a last name with her husband, who is a relief defendant-appellant in this case, we refer to these parties by their first names.

LPL Financial eligible to receive disgorged monies based on its reimbursement of some impacted investors.

Paul and CLT appeal, arguing the district court (1) exceeded its equitable powers in formulating its judgment; and (2) erred by designating LPL Financial a victim eligible to recover disgorged monies because, under 15 U.S.C. § 78u(d), a court may grant "equitable relief that may be appropriate or necessary for the benefit of investors." After outlining a court's equitable authority to order disgorgement and discussing whether the SEC must trace misappropriated funds to accounts and/or property held by a relief defendant, we conclude the SEC did not offer a permissible basis to support disgorgement in the amount of $865,000.00 as against CLT or the $109,927.95 as against Paul. Accordingly, we affirm in part and reverse in part, remanding for the district court to enter an order consistent with the disgorgement amounts proven by the SEC, as outlined in this opinion.

## I.    BACKGROUND

### A.    *Factual Background*

Sonya worked as a financial advisor for LPL Financial. By June 2004, Sonya began misappropriating funds from client accounts. The SEC's accounting expert, Mr. Hennigan, declared that Sonya misappropriated $2,300,023.00 in funds from sixteen investors during the course of her criminal conduct.[2] Sonya pleaded guilty to

---

[2] Sonya returned $152,320.00 to investors.

three criminal charges in a Colorado state court and is serving two consecutive ten-year sentences for a total of twenty years.

On August 23, 2017, the SEC commenced this action, seeking, in part, equitable disgorgement. Under the then-prevailing law, the SEC was permitted to seek disgorgement of monies Sonya embezzled during the five years preceding initiation of the action—from August 23, 2012, through August 23, 2017.[3] *See Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017) (holding disgorgement is a "penalty" within 28 U.S.C. § 2462 such that five-year statute of limitations applies). Initially, the SEC named Sonya as a defendant and CI and CLT as relief defendants. Through a Second Amended Complaint, the SEC added Paul as a relief defendant.

---

[3] While this matter pended on appeal, Congress, in passing the National Defense Authorization Act ("NDAA"), inserted a provision in 15 U.S.C. § 78u regarding the statute of limitations in both disgorgement actions and claims by the SEC for equitable remedies. *See* 15 U.S.C. §78u(d)(8); *see also* National Defense Authorization Act, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4626 (2021). Although we permitted the parties an opportunity to file supplemental briefs regarding the impact of the amendments to § 78u, the SEC did not contend that the amendments permitted recovery of monies Sonya embezzled outside the five-year statute-of-limitations period that controlled the proceedings in the district court. Accordingly, we confine our analysis to monies Sonya embezzled between August 23, 2012, and August 23, 2017. Further, as the dissent notes, the SEC does not rely upon the amendments to § 78u, which apply to all pending actions, to argue that disgorgement is now a legal remedy because the amendments create a new subsection entitled "disgorgement," apart from the subsection entitled "equitable relief." *Compare* 15 U.S.C. § 78u(d)(5), *with* 15 U.S.C. § 78u(d)(7); *see also* NDAA § 6501(b). Rather, the SEC maintains that it seeks equitable disgorgement in this case. Therefore, we limit our analysis to the contours of equitable disgorgement within a proceeding initiated by the SEC, leaving for another day whether the amended version of § 78u permits for disgorgement as a statutory-based remedy in law.

The SEC alleged CI was a Colorado corporation formed by Sonya in 2004 and over which Sonya remained the sole registered agent. The SEC further alleged that "[a]t [Sonya's] direction, and for no apparent consideration, checks and other instruments drawn on investors' accounts and made out to C-Investments were deposited in Camarco Investments' bank account." App. Vol. I at 12a. The SEC identified CLT as "a trust established in 2009," over which both Sonya and Paul were trustees. *Id.* And the SEC alleged that, "[a]t [Sonya's] direction, and for no apparent consideration, [CLT] holds assets that appear to have been purchased with investor funds." *Id.* Finally, the SEC alleged that Paul, "through [Sonya], received investor funds and assets purchased with investor funds" and "has no legitimate claim to such funds." *Id*.

The SEC's general theory of the case was that Sonya forged client signatures and drew checks on client accounts to the benefit of an account held by CI and her personal accounts. The SEC further contended that CI served as an intermediary entity, with Sonya orchestrating the transfer of funds from CI's account to CLT's account and using funds held by CI to finance the purchase of and/or partially maintain mortgages on real property held by CLT prior to the commencement of the disgorgement action. The SEC also claimed Sonya used funds in CI accounts to purchase artwork, furnishings, and home improvement items that were placed in or enhanced the real properties held by CLT. Finally, as to Paul, the SEC contended Sonya used ill-gotten investor funds to pay off a loan on his Jeep, pay his credit card

5

bills, and purchase airline tickets for him. The SEC does not claim Paul was aware of Sonya's embezzlement.

On the same day the SEC commenced this proceeding, it moved to freeze assets and bank accounts held by Sonya, CI, and CLT, including five real properties then held by CLT. Those properties are: (1) 106 Vale Street, Palmer Lake, CO 80133; (2) 18510 Woodhaven Drive, Colorado Springs, CO 80908; (3) 16970 Buffalo Valley Path, Monument, CO 80132; (4) 501 Greta Valley Road, Guffey, CO 80802; and (5) 30562 Old Coast Road, Gold Beach, OR 97444. The district court granted the motion and later issued a second order placing a freeze on some of Paul's accounts. As to the real properties, the order allowed for their sale but required "that the proceeds be frozen and submitted to the registry of the [c]ourt." Supp. App. at 82.

The SEC, followed by Paul and CLT, filed cross motions for summary judgment. In its motion, the SEC sought an order imposing (1) joint and several liability against Sonya and CI for a disgorgement amount of $903,631.10; (2) joint and several liability against Sonya and CLT for a disgorgement amount of $1,503,856.86, with an offset for any payments by CI; and (3) disgorgement in the amount of $118,475.92 against Paul. Paul and CLT countered by arguing, in part, that the district court lacked equitable powers to order the disgorgement sought by the SEC, the SEC was seeking legal disgorgement not authorized by statute, and the SEC could not adequately trace the investor funds taken by Sonya to property or money

held by CLT or Paul.[4] The district court issued a succinct order in which it granted the SEC's motion for summary judgment in part and denied Paul's and CLT's motion for summary judgment, concluding Sonya had conceded liability and disgorgement could be an equitable remedy. The district court scheduled a remedies hearing, in part to "grant [Paul] an opportunity to present evidence that some of the money the SEC wants to disgorge was in fact his own lawfully obtained money." App. Vol. I at 224a.

At the remedies hearing, the SEC called Mr. Hennigan as an expert in accounting to testify about Sonya's embezzlement and use of investor funds. To support his hearing testimony, Mr. Hennigan prepared various schedules detailing: (1) Sonya's withdrawals from accounts belonging to investors, and the accounts to which the funds were deposited or the credit cards to which the funds were applied, App. Vol. III at 521a–26a (Exhibit 7); 534a–38a (Exhibit 9); *see also* App. Vol. II at 238a–39a, 241a–42a (Mr. Hennigan's testimony about Exhibits 7 and 9 and admission of those exhibits into evidence); (2) transfers of funds from a CI account to an account ultimately controlled by CLT, App. Vol. III at 539a–40a (Exhibit 15); *see also* App. Vol. II at 242a–44a (Mr. Hennigan's testimony about Exhibit 10 and admission of that exhibit into evidence); (3) payments from a CI account to Paul's American Express ("Amex") credit card, Supp. App. at 103 (Exhibit 15); *see also*

---

[4] The SEC also moved to convert the scheduled jury trial into a remedies hearing, arguing that Sonya had already confessed liability and the SEC sought only equitable relief. Paul and CLT opposed the motion, contending the SEC's action sought a money judgment against their general assets, a form of relief that was not equitable in nature.

App. Vol. II at 249a (Mr. Hennigan's testimony about Exhibit 15 and admission of that exhibit into evidence); (4) charges made by Paul on an Amex credit card held by CI, Supp. App. at 104–05 (Exhibit 16); *see also* App. Vol. II at 249a–50a (Mr. Hennigan's testimony about Exhibit 16 and admission of that exhibit into evidence); (5) travel expenses charged to an Amex account held by CI, Supp. App. at 106–16 (Exhibit 17); *see also* App. Vol. II at 251a–54a (Mr. Hennigan's testimony about Exhibit 17 and admission of that exhibit into evidence); (6) rental income received from and mortgage payments made on real properties held by CLT, App. Vol. III at 541a–58a (Exhibit 21); *see also* App. Vol. II at 256a–60a (Mr. Hennigan's testimony about Exhibit 21 and admission of that exhibit into evidence); and (7) purchases of furniture, artwork, and home improvement items on an Amex account in CI's name, App. Vol. III at 561a–70a (Exhibit 25); *see also* App. Vol. II at 269a–70a (Mr. Hennigan's testimony about Exhibit 25 and admission of that exhibit into evidence). Mr. Hennigan also prepared flowcharts allegedly depicting the movement of money from investor accounts: to accounts held by Sonya or CI, to an account held by CLT, and to the financing of purchases of real properties at 106 Vale Street and 30562 Old Coast Road. App. Vol. III at 559a–60a (Exhibits 22 and 23); *see also* App. Vol. II at 260a–65a (Mr. Hennigan's testimony about Exhibits 22 and 23, and admission of those exhibits into evidence).

The admitted exhibits and Mr. Hennigan's testimony revealed that between August 31, 2012, and August 3, 2017, Sonya embezzled $1,789,175.78 from her clients. App. Vol. III at 521a–526a. Sonya initially disbursed that money as follows:

| Account | Holder | Amount Deposited |
|---|---|---|
| First Bank ending in 7119 <br> App. Vol. III at 521a–25a | CI <br> App. Vol. II at 241a | $1,117,567.10[5] <br> *See* App. Vol. III at 521a–25a |
| First Bank ending in 2491 <br> App. Vol. III at 523a | Initially Sonya and Paul but transferred to CLT in March 2016 <br> App. Vol. II at 243a–44a | $12,500.00 <br> App. Vol. III at 523a |
| Bank of America card ending in 5488 <br> App. Vol. III at 523a–26a | No testimony. Paul did not have access to the account. Appears controlled by Sonya based on Exhibit 22 <br> App. Vol. II at 296a; *see* App. Vol. III at 559a | $90,369.76[6] <br> *See* App. Vol. III at 523a–26a |
| Barclaycard credit card <br> App. Vol. III at 525a–26a | No testimony. Paul did not have access to the account. Appears controlled by Sonya based on Exhibit 22 <br> App. Vol. II at 295a; *see* App. Vol. III at 559a | $24,685.00 <br> *See* App. Vol. III at 525a–26a |
| Amex (unspecified account number) <br> App. Vol. III at 524a–26a | Not specified | $54,865.27 <br> *See id.* at 524a–26a |

[5] This amount includes a $37,864.09 transfer on May 26, 2017, to a CI FirstBank account for which the account number is not listed. *See* App. Vol. III at 525a.

[6] Exhibits 22 and 23, respectively, show the financing of the 106 Vale Street and the 30562 Old Coast Road properties. These exhibits suggest Sonya, between January 2015 and May 2017, used a total of $124,369.76 in investor funds to make payments to the Bank of America credit card ending in 5488. *See* App. Vol. III at 559a (reflecting transfers totaling $87,369.76), *id.* at 560a (reflecting transfers totaling $37,000.00). But Exhibit 7, which purports to detail all of Sonya's transactions misappropriating investor funds between August 31, 2012, and August 3, 2017, reflects only transfers from investor accounts to the Bank of America credit card ending in 5488, totaling $90,369.76. *See* App. Vol. III at 523a–26a. Whether Mr. Hennigan failed to capture some transactions when preparing Exhibit 7, or whether he double counted transfers to the Bank of America credit card ending in 5488 when preparing Exhibits 22 and 23, we cannot determine. And this is but one of several mathematical or transcription errors we identify in Mr. Hennigan's testimony and the schedules he prepared. Yet the district court adopted Mr. Hennigan's opinions wholesale, despite Paul and CLT challenging the accuracy of the credit card advances reflected on Exhibit 22, *id.* at 510a–11a.

| | | |
|---|---|---|
| Amex card/account bearing 1-53000<br>App. Vol. III at 523a–25a | CI/Sonya<br>*Id.* at 561a | $228,140.33<br>*See id.* at 523a–25a |
| Amex card/account bearing 1-54008<br>App. Vol. III at 525a–26a | Not specified | $26,530.80<br>*See id.* at 525a–26a |
| Air Academy account bearing 183819<br>App. Vol. III at 523a | Sonya<br>App. Vol. II at 245a–46a | $161,509.00[7]<br>*See* App. Vol. III at 523a |
| Wells Fargo credit card account ending in 3668<br>App. Vol. III at 523a–26a; *see also* App. Vol. II at 340a | Sonya<br>App. Vol. II at 340a | $65,000.00<br>*See* App. Vol. III at 523a–26a |
| Comenity Bank credit card<br>App. Vol. III at 523a | Not specified | $8,008.52<br>*Id.* at 523a |

Sonya used funds from many of the accounts listed in the above table and held by herself or CI to purchase and maintain real property, pay family expenses, acquire personal property, and infuse funds into accounts held by CLT. For instance, Sonya

---

[7] The $161,509.00 total is the result of three transfers of client funds to the Air Academy account: (1) a February 5, 2016, transfer of $46,479.00 for a Lexis loan; (2) a February 8, 2016, transfer of $65,015.00; and (3) a March 14, 2016, transfer of $50,015.00. App. Vol. III at 523a. Yet, Exhibit 23, purportedly detailing the financing for the property at 30562 Old Coast Road, identifies transfers into the Air Academy account from investor funds of (1) $46,468.78 on February 5, 2016; (2) $65,000.00 on February 8, 2016; and (3) $50,000.00 on March 14, 2016. *Id.* at 560a. Exhibit 23 also represents that Sonya withdrew a total of $125,000 from the Air Academy account—$50,000.00 to the benefit of CI's FirstBank account ending in 7119 and $75,000.00 to the benefit of CLT's FirstBank account ending in 2491. *Id.* These figures and exhibits present two problems/conflicts. First, while the dates of the transactions placing money into the Air Academy account match between the two exhibits, the numbers do not. *Compare id.* at 523a, *with id.* at 560a. Furthermore, if the February 5, 2016, transfer of $46,479.00 went to a "Lexis Loan," then other sources of money, not identified by Mr. Hennigan or the SEC, also supported the Air Academy account because the transfers of $65,000.00 on February 8, 2016, and $50,000.00 on March 14, 2016, are insufficient to cover the combined $125,000.00 in disbursements from the Air Academy account. Overall, where the SEC seeks disgorgement exceeding $1.5 million, we are troubled by the inconsistencies, inaccuracies, and lack of precision and detail in the schedules offered by Mr. Hennigan on behalf of the SEC.

oversaw the transfer of $259,973.00 in funds from CI's FirstBank account ending in 7119 to the FirstBank account ending in 2491, over which CLT gained control in March 2016.[8] *See* App. Vol. II at 243a–45a; App. Vol. III at 539a–40a. Sonya also used the CI Amex credit card account bearing 1-53000 to purchase $206,915.30 in home improvement and décor items, including $102,631.79 in artwork. App. Vol. III at 561a–70a; *see also* App. Vol. II at 269a–70a.

Sonya used monies originating, or partially originating, in investor funds for two additional purposes central to the issues in this appeal that warrant more detailed discussion.

1.    **Monies for the Benefit of Paul**

First, Paul received direct personal benefit from some investor funds. Between January 2013 and August 2017, Paul placed $6,161.39 in charges on Amex cards attached to a CI Amex account.[9] Supp. App. at 104–05; *see also* App. Vol. II at 250a. And, between October 2014 and September 2016, CI's FirstBank account ending in

---

[8] Mr. Hennigan testified that $262,473.00 was transferred from the CI FirstBank account ending in 7119 to the FirstBank account ending in 2491. App. Vol. II at 242a. And Exhibit 10, detailing the transfers, reflects that amount. App. Vol. III at 540a. However, Exhibit 10 contains a transfer of $2,500.00 on August 8, 2012, that occurred more than five years before the SEC commenced its action and outside the statute-of-limitations period. *Id.* at 539a.

[9] Mr. Hennigan testified that "Paul Camarco also held *an* American Express card that was part – under the main account of Camarco Investments." App. Vol. II at 250a (emphasis added). Exhibit 16, the schedule prepared by Mr. Hennigan detailing Paul's charges to the CI Amex account, however, identifies charges made on card*s* bearing 1-52010 and 1-53018. *See* Supp. App. 104–05.

7119 paid $34,017.26 toward Paul's personal Amex account. Supp. App. at 103; *see also* App. Vol. II at 249a–50a. In February 2016, CI also disbursed $43,200.00 from its FirstBank account ending in 7119 to ENT Credit Union to pay off the balance on a loan for Paul's Jeep Wrangler. App. Vol. III at 560a; Supp. App. 100–02. CI also wrote two checks, totaling $15,350.00, from its FirstBank account ending in 7119 to Paul—a January 2013 check for $350.00 and a February 2016 check for $15,000.00. Supp. App. at 98–99. Finally, Mr. Hennigan testified Sonya charged $11,178.70 in air travel expenses to CI's Amex account bearing 1-53000 related specifically to Paul's travel.[10] App. Vol. II at 254a; *see also* Supp. App. at 106, 116. Adding together the figures provided by Mr. Hennigan, Paul received benefits totaling $109,907.35 from accounts held by CI.[11]

---

[10] Mr. Hennigan relied upon Exhibit 17 for this figure. However, the amount Mr. Hennigan identified as "travel expenses that relate specifically to Paul Camarco as a ticketed passenger," App. Vol. II at 254a; *see also* Supp. App. at 116, does not include a $493.50 charge on January 19, 2014, for a trip from Denver to Houston to Philadelphia to Kansas City to Denver, *compare* Supp. App. at 107 (marked as a trip taken by Paul), *with id.* at 116 (not identifying $493.50 charge on January 19, 2014). Thus, it appears charges to the CI Amex account bearing 1-53000 where Paul was a ticketed passenger actually total $11,672.20.

[11] The master schedule prepared by Mr. Hennigan, Exhibit 1, listed a disgorgement amount of $109,927.95 against Paul. The $20.60 difference is the result of an apparent transcription error by Mr. Hennigan, identifying the payments by CI to Paul's Amex account as $34,037.86 on Exhibit 1 while only identifying $34,017.26 in payments on Exhibit 15, listing the eight payments from CI to Paul's Amex account. *Compare* App. Vol. III at 519a, *with* Supp. App. 103

2.      **Real Properties Held by CLT**

Second, the SEC asserted Sonya used investor funds to finance the purchases of and pay the mortgages on real properties. At the time the SEC commenced this action, CLT held title to five real properties. We discuss each of the five properties in the order they were purchased. We then discuss evidence presented at the remedies hearings regarding rental income received and mortgage payments made by CLT and Sonya on some of the properties

a.      *501 Greta Valley Road*

In April 2004, before Sonya misappropriated any client funds and over eight years outside the statute-of-limitations period, Sonya and Paul purchased an 800-square-foot log cabin in Guffey, Colorado. The couple purchased the property for $177,500.00. Sonya and Paul initially titled the property in Sonya's name, allegedly because her credit rating was better and would allow them to more easily secure a mortgage. Sonya and Paul paid around $28,000.00 as a down payment on the cabin, and Paul testified that he contributed toward the purchase price. Although Sonya and Paul planned to use the cabin as a vacation and horse-riding property, the cabin needed more work than they anticipated, and the couple instead turned it into a rental property. Paul testified he partook in the repair work and maintenance of the cabin.

In March 2016, Sonya transferred title of the cabin to CLT. The property was sold in April 2018 for $252,500.00. At the time of sale, Paul represented the mortgage balance was $186,404.00, leaving an estimated equity value of $75,000.00.

13

Sale of the property netted between $35,735.00 and approximately $54,000.00, which was deposited by Paul into a Vectra Bank account.

       b.      *18510 Woodhaven Drive*

In December 2004, a little less than eight years before the statute-of-limitations period but after the SEC alleges Sonya began embezzling investor funds, Sonya and Paul purchased a home at 18510 Woodhaven Drive in Colorado Springs and used it as their primary residence. Sonya and Paul paid $600,000.00 for the property. Paul testified that, to help pay for the property and to allow them to acquire the property with a minimal down payment, he quitclaimed a deed to Sonya on a home he owned and which they intended to sell. Paul further testified that the proceeds of the January 2005 sale of the quitclaimed home went directly to Sonya and, because she managed the family finances, he does not know if she applied the proceeds of the sale to the mortgage. Paul also testified he made regular payments to Sonya to cover a portion of the mortgage on the property.

In December 2009, Sonya transferred title of the Woodhaven residence to CLT. Records Paul presented show he continued to give Sonya money toward the mortgage after 2009. Paul testified that, in total, he gave Sonya $255,787.00 toward the mortgage. Paul also testified that since 2018, he had paid $50,000.00 directly on the mortgage, $10,000.00 for insurance and taxes, and $21,000.00 for improvements to the property. As of 2018, the Woodhaven residence had an estimated market value of $816,600.00. Paul represented the then-balance on the mortgage was $455,188.00, leaving an estimated equity value of $361,412.00.

14

c.      *16970 Buffalo Valley Path*

In August 2007, five years before the statute-of-limitations period, Paul and Sonya bought a ranch-style townhome at 16970 Buffalo Valley Path in Monument, Colorado. They purchased the property for Sonya's aunt so she could live closer to them. The couple purchased the property for $266,500.00. To facilitate the purchase, the couple refinanced their mortgage on the property at 501 Greta Valley Road, a property Paul testified had increased in value because it was a distressed property when they purchased it and they had put substantial work into it.

At the time of the district court proceeding, the Buffalo Valley Path property was listed for sale at $388,000.00. Paul represented the remaining mortgage on the home was $220,718.00. In January 2019, the home sold and Paul estimated sale of the property netted approximately $135,000.00, that he deposited into an account at the Vectra Bank.

d.      *30562 Old Coast Road*

In May 2016, within the statute-of-limitations period, Paul and Sonya purchased a property in Golden Beach, Oregon. The couple purchased the property as a vacation rental and investment property. The purchase price for the property was approximately $725,000.00. App. Vol. III at 560a; *see also* App. Vol. I at 154a. Purchase of the property was financed by a March 2016 down payment of $10,000.00 and a May 2016 wire transfer of $219,509.13, both from CLT's FirstBank account ending in 2491. App. Vol. III at 560a. At the remedies hearing, the SEC presented evidence showing that, in the three months prior to the purchase, a total of

15

$261,646.02 was deposited into the CLT FirstBank account ending in 2491. *Id.* This money was deposited into the CLT FirstBank account from four sources: (1) $24,000.00 from a Bank of America card ending in 5488; (2) $75,000.00 from Sonya's Air Academy account; (3) a total of $52,573.00 from five deposits from CI's FirstBank account ending in 7119;[12] and (4) $110,173.02 from Empire Title of Colorado Springs, a deposit that followed refinancing of the properties at 501 Greta Valley Road and 16970 Buffalo Valley Path.[13] *Id.* The SEC did not, however, admit into evidence any exhibit showing how much money was in the FirstBank account ending in 2491 prior to February 2016 or prior to August 23, 2012, when the statute-of-limitations period commenced. Thus, while we know enough money entered the FirstBank account ending in 2491 between February and May of 2016 to cover the purchase of the 30562 Old Coast Road property, we do not know whether other monies, aside from the deposits identified in Exhibit 23, were in the FirstBank account ending in 2491 at the time funds were used from the account to purchase the property.

---

[12] These five deposits were also captured on Exhibit 10, the schedule listing all deposits from CI's FirstBank account ending in 7119 to CLT's FirstBank account ending in 2419. *See* App. Vol. III at 539a–40a.

[13] These four deposit figures provided by the Mr. Hennigan and the SEC actually total $261,746.02, not the asserted amount of $261,646.02. *See* App. Vol. III at 560a. Whether Mr. Hennigan made a transcription error when identifying the deposit figures or a computation error when adding the figures, we cannot say. And while not the largest error from a monetary perspective, the sheer number of computation and transcriptional errors in the exhibits offered by Mr. Hennigan and the SEC is concerning.

At the time of the district court proceedings, the 30562 Old Coast Road property was being rented. Paul estimated the property had an equity value of $334,394.

e.    *106 Vale Street*

Finally, in 2017, also within the statute-of-limitations period, Sonya purchased a property at 106 Vale Street, Palmer Lake, Colorado. Sonya purchased the property for $212,000.00, using funds from her Air Academy account bearing 183819. *Id.* at 559a. This purchase consisted of $2,500.00 in earnest money paid on May 15, 2017, and a $209,545.56 wire transfer on June 15, 2017. *Id.* Sonya made this purchase without first consulting Paul, and Paul testified he is unaware of how Sonya paid for the property. In fact, Paul conceded he has no financial interest in this property. As for the title, Sonya initially listed herself on the title but later quitclaimed the property to CLT.

Exhibit 22, prepared by Mr. Hennigan, purport to show how Sonya financed the purchase of the property. *Id.* Exhibit 22 identifies an estimated $215,800.00 in deposits into the Air Academy account between May 26, 2017, and June 9, 2017. *Id.* These deposits came from six sources: (1) $23,800.00 from Sonya's Wells Fargo credit card account ending in 3668; (2) $18,000.00 from the Barclaycard account; (3) $60,000.00 from the CI FirstBank account ending in 7119; (4) $35,000.00 from a Discover loan; (5) $29,000.00 from the Bank of America card ending in 5488; and (6) an estimated $50,000.00 in commissions from LPL Financial. However, as with the exhibit purportedly depicting the FirstBank account and the financing of the

17

30562 Old Coast Road property, the SEC did not present any evidence showing how much money was in Sonya's Air Academy account prior to May 2017 or prior to August 23, 2012, when the statute-of-limitations period commenced. *See id.* Thus, while the SEC identified more money entering the Air Academy account in May and June 2017 than the total payments for the purchase of the 106 Vale Street property, we do not know whether other monies, aside from the deposits identified in Exhibit 22, were in the Air Academy account at the time funds were used from the account to purchase the property. In fact, where the earnest money payment was made on May 15, 2017, but the first date-specific deposit into the Air Academy account was on May 26, 2017, it seems likely that other monies not identified by Exhibit 22 were in the Air Academy account. *See id.*

The 106 Vale Street property was sold in May 2018 for $235,000.00, netting a sum of approximately $217,000.00. Paul placed the proceeds from this sale in a Vectra Bank account, albeit a different account than the account holding the proceeds from the sales of the 501 Greta Valley Road and 16970 Buffalo Valley Path properties.

f.      *Rental income & mortgage payments*

Mr. Hennigan prepared a schedule—Exhibit 21—detailing rental income and mortgage payments for real properties held by CLT. *Id.* at 541a–58a. The exhibit identified total rental income of $176,640.13. *Id.* at 558a. That sum went into three accounts: (1) $62,668.30 into the FirstBank account ending in 2491, initially held by Sonya and Paul and later transferred to CLT; (2) $33,128.33 into Sonya's Air

18

Academy account; and (3) $80,843.50 into Sonya's Wells Fargo account ending in 2271. *Id.* at 541a, 558a.

Exhibit 21 also identified mortgage payment disbursements totaling $241,500.00, of which $203,000.00 was taken from CLT's FirstBank account ending in 2491 and $38,500.00 was taken from Sonya's Air Academy account. *Id.* Mr. Hennigan testified that Exhibit 21 showed the rental properties were not financially self-sustaining, and there was a shortfall of approximately $65,000.00 over the course of eight years. App. Vol. II at 309a–11a.

These figures, however, include seventy-one transactions, spanning five pages of the exhibit, that occurred between August 5, 2009, and August 13, 2012—all before the statute-of-limitations period. App. Vol. III at 541a–45a. These pre-statute-of-limitations-period transactions amount to $30,482.50 in rental income deposits and $46,800.00 in mortgage payment disbursements.[14] *See id.* Thus, the pre-statute-of-limitations-period shortfall on the properties totaled $16,317.50. *See id.* When this amount is deducted from the total shortfall of $64,859.87 between rental income deposits and mortgage payment disbursements depicted in Exhibit 21, the shortfall amount within the statute-of-limitations period totals $48,542.37.[15] *See id.*

---

[14] Of the pre-statute-of-limitations-period deposits, $9,482.50 went into the FirstBank account ending in 2491 while $21,000.00 went into Sonya's Wells Fargo account ending in 2271. All of the pre-statute-of-limitations-period disbursements came from CLT's FirstBank account ending in 2491. *See* App. Vol. III at 541a–45a.

[15] Just as the district court did not comment on Mr. Hennigan's inclusion of pre-statute-of-limitations-period data in Exhibits 10 and 17, it did not address Mr. Hennigan's inclusion of a significant amount of pre-statute-of-limitations-period

### B.    Disgorgement Amounts Sought by the SEC

The disgorgement sums sought by the SEC varied throughout the course of the

district court proceedings. *Compare id.* at 584a–85a, *with id.* at 493a and App. Vol. I

at 49a–52a. Following the remedies hearing, the SEC submitted its closing argument,

seeking disgorgement in the following amounts: (1) $1,526.927.83 from Sonya;

(2) $576,516.06 from CI, to be imposed jointly and severally with the amount sought

from Sonya; (3) $109,927.95 from Paul; and (4) $865,000.00 from CLT.[16]

During the remedies hearing, Mr. Hennigan used two methods to establish a

disgorgement figure as against CLT. First, Mr. Hennigan identified an amount

---

data in Exhibit 21, even though Paul and CLT raised the issue in their post-remedies-hearing brief, App. Vol. III at 511a.

[16] During the remedies hearing, counsel for the SEC asked the court to impose the disgorgement amount sought from CLT jointly and severally to the disgorgement amount sought from Sonya. Both the SEC's brief submitted following the remedies hearing, and the proposed judgment submitted by the SEC, reference imposing liability against CI jointly and severally with Sonya but neither mentions imposing liability against CLT jointly and severally with Sonya. Separately, the summary schedule prepared by Mr. Hennigan did not identify the purchases of artwork, furnishings, and home improvement expenditures as part of the $576,516.06 retained by CI. *See* App. Vol. III at 520a. And, at the remedies hearing, Mr. Hennigan appeared to count the $206,915.30 in artwork, furnishings, and home improvement expenditures as items benefiting CLT and as part of his disgorgement figure for CLT. App. Vol. II at 312a–13a. The district court likewise understood that the artwork and furnishings were part of CLT's, not CI's and Sonya's, disgorgement totals. *See id.* at 313a ("I don't have too much difficulty figuring that the personal property in the CLT properties belongs to CLT for this purpose. That's another 206. That takes us over 800,000."). Further, Paul and CLT sought to have the proceeds from the sale of such items applied first to CLT's disgorgement obligation. But the SEC's proposed order sought to credit proceeds from the sale of the artwork toward Sonya's and CI's disgorgement obligation, not toward CLT's disgorgement obligation.

somewhat in excess of $865,000.00 by taking the total amount of funds misappropriated by Sonya during the statute-of-limitations period—$1,789,175.78—and reducing that amount by the (1) $109,927.95 that went to Paul's benefit; (2) $576,516.06 retained by CI; and (3) $152,320.00 in funds returned to investors by Sonya.[17] *See id*. at 519a–20a, 532a–33a; App. Vol. II at 313a–16a; *see also* App. Vol. III at 587a–88a (district court discussing Mr. Hennigan's formula). But Mr. Hennigan's testimony on this point was not entirely consistent. When questioned by the district court regarding "the total amount of tainted funds that got into the trust at one time or another," Mr. Hennigan initially responded, "I believe, as far as directly into the trust, would be the 1.636, less the 109 for the benefit of [Paul], less the 576,500 retained by [CI]." App. Vol. II at 316a. But, moments later, the court again asked Mr. Hennigan "what is the amount that went into the trust from tainted funds? Give us the number and tell us how you got the number." *Id.* at 317a. This time, Mr. Hennigan responded:

> I don't know that I can state a number, because the funds were so commingled in so many different buckets along the way that it's difficult to say, because some of the funds might have gone into [CI], and they in turn were charged on the [CI] account, and we believe some of that went to benefit some of the properties, and I don't know that we have enough documentation in front of us to get an absolute number. I think these are kind of broad indicators of where the funds went.

*Id.*

---

[17] Under this formula, CLT's disgorgement amount would total $950,411.77.

21

Shortly after this response, counsel for the SEC interjected and stated: "Your Honor, if this may help, we did not ask Mr. Hennigan to trace the money that went to [CLT]." *Id.* Rather, the SEC's theory at the time of the remedies hearing, relative to disgorgement from CLT, focused on what might be called the secondary benefits CLT received from Sonya's misappropriation of money to increase the general pot of funds available to Sonya:

> THE COURT: You're asking then for the trust to disgorge more than it ever got? How can it do that?
> MS. ATKINSON: [18] Your Honor, would you like me to address that now or in argument?
> THE COURT: I'm still trying to figure out what the trust got.
> MS. ATKINSON: Well, Your Honor, the fact of the matter is --
> THE COURT: You don't know what the trust got. Your witness doesn't know what the trust got.
> MS. ATKINSON: The fact of the matter is that most of the money that was stolen from investors went for the benefit of the Camarco family. It went to all kinds of things. It went to—to, you know, buy slipcovers for their house. It went to their—their country club. It went for travel expenses.
> THE COURT: Oh, I believe that. They lived high and mighty.
> MS. ATKINSON: Yes.
> THE COURT: They took nice trips all over the world. They had nice houses. They had this and that. I get that. I don't have any sympathy for that, but I'm trying to figure out what the numbers are.
> MS. ATKINSON: But that enabled *other money* to go to buy these properties. So [CLT] is the Camarcos. [CLT] is Sonya and Paul Camarco.

*Id.* at 318a–19a (emphasis added).

Second, Mr. Hennigan, during cross-examination, combined figures from the various exhibits to reach a more definite amount of tainted funds received by CLT.

---

[18] Ms. Atkinson served as counsel for the SEC.

Under this approach, Mr. Hennigan reached the amount of $833,388.30, comprised of (1) $262,473.00 in transfers from CI's FirstBank account ending in 7119 to CLT's FirstBank account ending in 2491, App. Vol. II at 303a; App. Vol. III at 539a–40a; (2) $149,000.00 in investor funds that supported the purchase of the 30562 Old Coast Road property, App. Vol. II at 306a–07a; *see also* App. Vol. III at 560a (Exhibit 23 depicting financing of 30562 Old Coast Road property); (3) approximately $150,000.00 in investor funds that supported the purchase of the 106 Vale Street property, App. Vol. II at 308a–09a; *see also* App. Vol. III at 559a (Exhibit 22 depicting financing of 106 Vale Street property); (4) $65,000.00 based on the shortfalls between rental income and mortgage payments on the properties between August 2009 and August 2019, App. Vol. II at 309a–10a; *see also* App. Vol. III at 541a–58a; and (5) $206,915.30 in artwork, furnishings, and home improvement items, App. Vol. II at 311a–12a; *see also* App. Vol. III at 561a–64a.

In its post-hearing brief, the SEC reached its figure of $865,000.00 by way of (1) money in CLT bank accounts; (2) the equity value of the 30562 Old Coast Road property; (3) the proceeds from the sales of the 106 Vale Street, 16970 Buffalo Valley Path, and 501 Greta Valley Road properties; and (3) 50% of the equity value of the 18510 Woodhaven Drive property.[19] In support of receiving half the equity value of the 18510 Woodhaven Drive property, the SEC argued:

---

[19] CLT argued that if the form of disgorgement sought by the SEC was equitable, the SEC had only established a disgorgement amount of $528,096.00 as against CLT. CLT reached this amount based on (1) 86.32% of the funds transferred from the CI FirstBank account ending in 7119 to the CLT FirstBank account ending

Paul Camarco testified that prior to getting [a job in 2007], his commission income "was very inconsistent" and his credit was not good and thus he did not always pay his share of Woodhaven expenses. More importantly, [Paul] and his son with Sonya, Dominic, lived in that well-appointed, three-bedroom horse property that was being funded, in part, by Paul Camarco, but also, largely by Sonya's investors, for the past 15 years. So even if the [c]ourt were to credit [Paul's] testimony that he paid half the expenses, he, unlike Sonya's defrauded investors, got something significant for his money. And this doesn't even take into account any of the other benefits he and his son received from his wife's crimes—lavish vacations, a country club, school tuition, etc. As the [c]ourt noted at the Hearing: "It wasn't just Sonya consuming all this money. It was Sonya and the family." For these reasons, the SEC believes its offer to split the equity in Woodhaven equally is fair to both Paul Camarco and Sonya Camarco's defrauded investors.

App. Vol. III at 496a (internal citations omitted).

### C.      District Court's Ruling & Judgment

The district court commenced its written ruling by summarizing the evidence and testimony presented at the remedies hearing. The district court then announced its findings and conclusions. The district court found Mr. Hennigan's testimony to be "credible" and the figures offered by Mr. Hennigan in Exhibit 1 to be "generally reasonable given the difficulties created by the com[m]ingling." *Id.* at 591a. Based on

---

in 2419—a total of $226,569.00; (2) $99,000.00 in additional transfers to CLT's FirstBank account ending in 2419 relative to the purchase of the 30562 Old Coast Road property; (3) $51,792.00 attributable to the purchase of 106 Vale Street, equaling 86.32% of the $60,000.00 transferred from CI's FirstBank account ending in 7119; and (4) $150,735.00 relative to the artwork, furnishings, and home improvement items, equaling 86.32% of their purchase price less $32,292.00 in outstanding credit card bills for those items. CLT also argued no disgorgement should be ordered relative to the shortfall between rental income and mortgage payments because the mortgage payments were paid from CLT's FirstBank account ending in 2491, and the transfers from CI's FirstBank account ending in 7119 had already captured the money CLT received.

the opinions provided by Mr. Hennigan, the district court settled upon a total disgorgement amount of $1,636,855.78. As to Paul, the district court concluded Mr. Hennigan's opinion that Paul benefited to the tune of $109,927.95 from Sonya's misappropriation of funds was "well supported and reasonable." *Id*. at 592a. Relative to the travel expenses, while the district court considered the possibility that Paul contributed to ground expenses in exchange for Sonya purchasing the flights, the court believed any payments by Paul were "probably more than offset by other contributions to the family's living style made possible by [Sonya's] thefts." *Id.*

As to Sonya, the court concluded her disgorgement amount was $1,526,927.83, equal to the total disgorgement amount minus Paul's disgorgement amount. And the court held CI liable for $576,516.06 in disgorgement, jointly and severally with Sonya.

As to CLT, the court acknowledged that it was "impossible to determine from evidence in the record the precise amount of misappropriated funds or derived from misappropriated funds that was transferred into the Trust." *Id.* at 593a. The district court noted the uncertainty in Mr. Hennigan's testimony, despite his initial statement that CLT received $950,411.77. Ultimately, the district court found "that $865,000 is a conservative but reasonable estimate of the Trust assets excluding the Artwork and the Piano."[20] *Id.* As to the real properties, the district court concluded that while Paul

---

[20] The district court declined to determine whether CLT, CI, or Sonya owned the artwork and piano, merely noting that they were "disgorgable assets." App. Vol. III at 594a.

"contributed some amount to the purchase of the Greta Valley Road property" and might have contributed to the purchase of the other properties, it lacked sufficient evidence to determine the amount of his contribution. *Id.* at 594a. To satisfy the disgorgement amounts against CLT and Paul, the court ordered that the 30562 Old Coast Road and 18510 Woodhaven Drive properties be listed for sale, with Paul being permitted to receive 50% of the net proceeds from the sale of the latter property. The court also permitted Paul to receive $38,000.00 from the already completed sale of the other three properties. And the court allowed Paul to retain the furnishings in the 18510 Woodhaven Drive property, with the exclusion of the artwork and the piano.

The district court's order also provided guidelines for the distribution of disgorged funds. The district court precluded the disgorged funds from going to the benefit of the U.S. Treasury and directed that, "to the maximum extent reasonably possible," the funds "should be used to reimburse the victims of [Sonya's] thefts and fraud." *Id.* at 594a. But the district court specifically included LPL Financial as one of the victims, noting that it had reimbursed some of the investors.

### D.   *Appellate Proceedings*

Paul and CLT appealed the district court's order and judgment. The appeal was abated for proceedings in *Liu v. SEC*, 140 S. Ct. 1936 (2020). After the Supreme Court issued its opinion in *Liu*, the SEC moved for a limited remand to the district court for consideration of *Liu*. Paul and CLT opposed the SEC's motion for a limited

remand. A two-judge panel of this court denied the SEC's motion without prejudice to renewal after Paul and CLT submitted their opening brief.

In their opening brief, Paul and CLT argue the district court exceeded its equitable authority to order disgorgement because it relied upon ballpark figures to establish the disgorgement amount rather than determining what investor funds could be traced to accounts, real property, or personal property possessed by Paul or CLT. Paul and CLT liken the tracing requirement for which they argue to the tracing requirement in Employment Retirement Income Security Act ("ERISA") disgorgement actions. Paul and CLT also argue the district court erred by identifying LPL Financial as a victim able to receive disgorged funds because 15 U.S.C. § 78u(d) allows for entry of an order of disgorgement "for the benefit of investors," but LPL Financial was not an investor.

The SEC argues the district court did not exceed its equitable authority in ordering disgorgement where Paul and CLT lacked a legitimate claim to the money and property the district court ordered disgorged. The SEC also contends the level of tracing for which Paul and CLT argue—i.e., tracing required for disgorgement in ERISA proceedings involving fiduciaries—was not applicable in an SEC equitable disgorgement proceeding. Finally, given that LPL Financial reimbursed some of Sonya's clients, the SEC argues the district court was within its authority to identify LPL Financial as a potential recipient of disgorged funds because allowing a financial institution to recover disgorged funds where the institution reimbursed

27

investors would encourage such action in the future and indirectly benefit investors as a class.

## II.    DISCUSSION

We start by outlining the applicable standard of review. Then we discuss principles generally governing equitable disgorgement and the degree of tracing of funds necessary to support an order requiring disgorgement. Applying those principles to the district court proceeding, we conclude none of the methods offered by Mr. Hennigan and the SEC for calculating the disgorgement amount as to CLT and Paul are capable of sustaining the district court's ruling. Rather, the SEC's evidence supports lesser disgorgement amounts. Finally, we address the propriety of the district court identifying LPL Financial as an entity eligible to receive disgorged monies.

### A.    *Standard of Review*[21]

We apply a mixed standard of review to a district court order requiring disgorgement in a proceeding initiated by the SEC. An overarching abuse of discretion standard applies, and also governs the district court's calculation of the

---

[21] Federal Rule of Appellate Procedure 28(a)(8)(B) requires the appellant to identify the applicable standard of review in its opening brief. Paul and CLT did not satisfy this requirement. Although "[t]he omission of such a basic component of an appellate brief is inexcusable" and could serve as a basis for dismissing Paul and CLT's appeal, *MacArthur v. San Juan Cnty.*, 495 F.3d 1157, 1161 (10th Cir. 2007), we decline to exercise our discretion to dismiss the appeal. The SEC did not raise an argument for dismissal in its corrected response brief and Paul and CLT's opening brief otherwise complies with the Federal Rules of Appellate Procedure and the Tenth Circuit Local Rules and is well under the word limit for opening briefs, *see* Fed. R. App. P. 32(a)(7)(i).

disgorgement award. *See FTC v. LoanPointe, LLC*, 525 F. App'x 696, 699 (10th Cir. 2013) (unpublished); *see also SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006) (holding no abuse of discretion in district court's calculation of disgorgement award). However, we apply de novo review to a district court's "method" of determining a disgorgement award. *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1251 (10th Cir. 2020). And a district court's understanding of its authority to award disgorgement is a question of law that we also review de novo. *SEC v. AMX Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993).

Separately, "[w]e have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." *Jordan v. U.S. Dep't of Justice*, 668 F.3d 1188, 1200 (10th Cir. 2011) (quotation marks omitted) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) as a secondary supporting source). "Thus, we my affirm on an alternate legal ground instead of sending the case back to the district court to do the work provided that the alternate ground is within our power to formulate." *Id.* (quotation marks omitted); *see also SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (modifying disgorgement award to correct miscalculation by district court). As to this last requirement, "[w]e may affirm on alternative grounds only when those grounds are dispositive, indisputable, and appear clearly in the record." *United States v. Schneider*, 594 F.3d 1219, 1227 (10th Cir. 2010) (quotation marks omitted).

### B.    Equitable Authority to Order Disgorgement

The governing provision for equitable relief in an SEC proceeding states, "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). First, we discuss the general principles governing equitable relief and the difference between equitable relief and legal remedies. Second, we discuss what the SEC must prove and the degree of tracing necessary before a court may order equitable disgorgement.

### 1.    General Principles Governing Equitable Disgorgement

"'Equitable' relief must mean *something* less than *all* relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 n.8 (1993). "'[S]tatutory references' to a remedy grounded in equity 'must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes.'" *Liu*, 140 S. Ct. at 1947 (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002)). And before a district court may order a form of relief under § 78u(d)(5), it must analyze whether the relief "falls into 'those categories of relief that were *typically* available in equity.'" *Id.* at 1942 (quoting *Mertens*, 508 U.S. at 256). Determining "whether the remedy a plaintiff seeks 'is legal or equitable depends on (1) the basis for the plaintiff's claim and (2) the nature of the underlying remedies sought.'" *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016) (quoting *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356,

30

363 (2006)). In evaluating these considerations, the Supreme Court has frequently turned to treatises on equity, including the Restatement (Third) on Restitution and D. Dobbs, Law of Remedies. *See id.* ("To determine how to characterize the basis of a plaintiff's claim and the nature of the remedies sought, we turn to standard treatises on equity, which establish the 'basic contours' of what equitable relief was typically available in premerger equity courts." (quoting *Knudson*, 534 U.S. at 217)); *see also Liu*, 140 S. Ct. at 1943; *Knudson*, 534 U.S. at 213–14.

In *Liu*, the Supreme Court observed that courts, for some fifty years, have recognized that disgorgement, a form of restitution, is an equitable remedy available to the SEC through § 78u(d)(5). *See Liu*, 140 S. Ct. at 1940–41 (citing *SEC v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir. 1971)). But *Liu* also observed that the SEC has pushed the bounds of disgorgement as an equitable remedy. *Id.* at 1946. And *Liu* identifies "three main ways" that more recent disgorgement orders push those bounds: (1) "ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims," (2) "imposing joint-and-several disgorgement liability," and (3) "declining to deduct even legitimate expenses from the receipts of fraud." *Id.*; *see also id.* at 1945 ("Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory."). Thus, while disgorgement can take the form of an equitable remedy, the type and extent of disgorgement sought by the SEC has not always conformed to limitations on a federal court's equitable authority.

## 2.    Tracing Requirement

The parties dispute the degree to which the SEC must trace misappropriated funds to accounts and/or assets held by the relief defendants in order to obtain an equitable disgorgement order. Paul and CLT argue that the rules governing equitable disgorgement in the ERISA context apply and the SEC must trace funds taken by Sonya to accounts and/or assets currently in Paul's or CLT's possession. Under Paul's and CLT's theory, the SEC must establish not only the amount of investor funds they each received, but also that the funds, or assets purchased with the funds, are still in their possession. And Paul and CLT dispute a court's ability to order disgorgement payments from a relief defendant's general assets equal to the amount of tainted funds a given relief defendant received.

Meanwhile, the SEC contends that *Liu* confirms a district court's authority to seek disgorgement as an equitable remedy, including against relief defendants who merely received ill-gotten funds. The SEC further contends that tracing requirements in an ERISA disgorgement action do not apply because the SEC is not a private party seeking to recover funds to its own benefit.

It is certainly the case that Supreme Court decisions in SEC disgorgement actions have referenced ERISA cases when discussing the difference between legal and equitable remedies. *See Liu*, 140 S. Ct. at 1942 (first citing *Mertens*, 508 U.S. at 256; *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011); then citing *Montanile*, 577 U.S. at 142; and then citing *Knudson*, 534 U.S. at 217). But neither *Liu* nor *Kokesh*, the only Supreme Court cases involving SEC disgorgement actions cited by Paul and

32

CLT, hold that strict tracing requirements apply to an equitable disgorgement action brought by the SEC. *See id.* at 1940 ("The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)."); *Kokesh*, 137 S. Ct. at 1645 (holding that disgorgement is a penalty for purposes of the statute of limitations period). And our review of the case law demonstrates that courts have taken a less demanding approach regarding tracing once the SEC establishes the amount of tainted money a party received.

In *Kokesh*, the Supreme Court defined disgorgement, stating that "[g]enerally, disgorgement is a form of 'restitution measured by the defendant's wrongful gain.'" 137 S. Ct. at 1640 (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51, cmt. a (AM. L. INST. 2010)). Disgorgement is intended to "require[] that the defendant give up 'those gains properly attributable to the defendant's interference with the claimant's legally protected rights'" and "'deprive defendants of their profits in order to remove any monetary reward for violating' securities laws and to 'protect the investing public by providing an effective deterrent to future violations.'" *Id.* (first quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51, cmt. a; and then quoting *SEC v. Tex. Gulf Sulphur Co.*, 312 F. Supp. 77, 92 (S.D.N.Y. 1970)). Notably, nothing in the Supreme Court's description of disgorgement suggests the party ordered to disgorge money must still possess the specific ill-gotten funds at the time of the disgorgement action. And imposing the strict tracing requirement argued for by Paul and CLT would not further

the goals of disgorgement because a savvy embezzler could quickly spend the money

on luxury vacations, secrete ill-gotten funds away in a location or foreign bank

account not detectable by authorities, or so commingle tainted funds with untainted

funds as to make it impossible to trace the tainted funds to their final resting place.

Circuit court case law further supports the proposition that the SEC need not

meet the strict tracing requirements proposed by Paul and CLT to obtain an equitable

disgorgement order. Starting with our own law, we have concluded that a

disgorgement order that "results in a 'reasonable approximation' of illegal profits"

falls within a district court's broad discretion to order equitable disgorgement.

*Maxxon, Inc.*, 465 F.3d at 1179 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d

1450, 1474–75 (2d Cir. 1996)); *see also RaPower-3, LLC*, 960 F.3d at 1253 ("In our

view, the district court's computation [of the equitable disgorgement amount] was

not clearly erroneous because it was a reasonable approximation."). If a "reasonable

approximation" of ill-gotten gains is sufficient to support a disgorgement order, strict

tracing must not be required because strict tracing would lead to a very specific

amount of money or piece of property to be disgorged.[22]

---

[22] The dissent argues *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006), and presumably also *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1253 (10th Cir. 2020), hold no precedential or persuasive value with respect to strict tracing because they arise in the accounting-for-profits context. Dissent Slip Op. at 7–9. Accounting-for-profits, where ill-gotten funds generate revenue for the wrongdoer beyond the initially ill-obtained funds, is but one of several components of the total amount of ill-gotten monies a defendant or relief defendant may have netted. We see little reason to treat monies acquired through direct fraudulent means—*e.g.*, embezzlement—differently from profits a defendant acquires through a business built on fraudulently obtained funds. Otherwise, a fraudster who embezzles

Out-of-circuit authority either makes no mention of a strict tracing requirement when establishing the disgorgement amount or explicitly rejects such a requirement. For instance, the Ninth Circuit merely requires the SEC, in an equitable disgorgement action, to prove the parties against whom it seeks a disgorgement order "(1) received ill-gotten funds and (2) do not have a legitimate claim to those funds." *SEC v. World Cap. Mkt., Inc.*, 864 F.3d 996, 1004 (9th Cir. 2017); *see also SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (stating that "[t]he SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains" without any mention of a tracing requirement to funds or property held by the defendant). More directly, the Eighth Circuit has held that the proposition that the SEC must satisfy a strict tracing requirement and identify specific assets obtained with ill-gotten funds "finds no support in our precedent or elsewhere in the extensive body of case law on securities fraud. . . . To the contrary, 'the Federal Reporter is replete with instances in which judges deeply familiar with equity practice have permitted the SEC to obtain disgorgement without any mention of tracing.'" *SEC v. Quan*, 817 F.3d 583, 594 (8th Cir. 2016) (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 374 (2d Cir.

---

money and spends it for personal pleasure before the SEC commences a disgorgement proceeding would be free and clear while an entrepreneurial fraudster who places ill-gotten funds into a new business venture would be liable in equitable disgorgement for any profits from that business venture regardless of whether he or she dissipated those profits before the SEC commenced its action. Accordingly, although *Maxxon* and *RaPower-3 LLC* arose in the accounting-for-profits context, their adoption of a reasonable approximation standard for determining the amount of ill-gotten funds a defendant received is instructive here.

2011)).[23] And, in rejecting the proposition that the SEC must trace funds to accounts or property held by the individual ordered to disgorge, the Eighth Circuit distinguished between private parties seeking disgorgement in a contract dispute and the SEC acting on behalf of investors and the public interest. *Id*.; *see also SEC v. Teo*, 746 F.3d 90, 102–06 (3d Cir. 2014) (discussing distinctions between action initiated by private party and action initiated by SEC).

---

[23] *See also SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[A] court 'may exercise its equitable power of disgorgement only over property causally related to the wrongdoing.' As the SEC points out, the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge. To hold . . . that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. Under [this] approach, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement. [This] would be a monstrous doctrine for it would perpetuate rather than correct an inequity." (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989))); *see also SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1261 (9th Cir. 2013) ("In calculating disgorgement, a district court need only make a 'reasonable approximation of profits causally connected to the violation' and is 'not required to trace every dollar of the offering proceeds fraudulently retained by' the defendants." (quoting *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998))); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 374 (2d Cir. 2011) ("Indeed, it is by now so uncontroversial that tracing is not required in disgorgement cases that we recently rejected an argument to the contrary via summary order."); *SEC v. Rosenthal*, 426 F. App'x 1, 3 (2d Cir. 2011) (unpublished) ("The SEC is not required to trace specific funds to their ultimate recipients . . . . Imposing such a tracing requirement would allow an insider trading defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or . . . by commingling and transferring such profits. . . . Denying disgorgement . . . because of the SEC's inability to trace the funds would be inconsistent with disgorgement's purpose 'to prevent unjust enrichment.'" (quoting *Banner Fund Int'l*, 211 F.3d at 617)).

The dissent encourages us to, in light of *Liu v. SEC*, 140 S. Ct. 1936 (2020), reconsider whether a reasonable approximation of ill-gotten funds is sufficient to permit for equitable disgorgement such that the SEC need not strictly trace funds to a defendant's or relief defendant's possessions when pursuing equitable disgorgement. Dissent Slip Op. at 3–4. For several reasons, we decline to deviate from the long line of cases rejecting any strict tracing requirement.

First, *Liu* acknowledged the availability of disgorgement as an equitable remedy in an SEC proceeding, as earlier implicitly recognized in *Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017). 140 S. Ct. at 1946. Further, while *Liu* identified three ways in which the SEC had stretched the bounds of equitable disgorgement over time, none of the three ways involved the SEC seeking disgorgement of a reasonable approximation of tainted funds received rather than seeking only those ill-gotten funds the SEC could trace to funds or possessions held by the defendant or relief defendant at the time the SEC sought disgorgement. *See* 140 S. Ct. at 1940–41, 1945. Yet, as discussed earlier and a point with which the dissent does not disagree, prior to *Liu*, courts routinely, seemingly uniformly, awarded equitable disgorgement based on a reasonable approximation method without requiring the strict tracing of funds. *See SEC v. Quan*, 817 F.3d 583, 594 (8th Cir. 2016) (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 374 (2d Cir. 2011)); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996). While the Supreme Court might, one day, adopt the strict tracing requirement advanced by our dissenting colleague, we do not believe

37

*Liu* provides sufficient basis to displace the reasonable approximation standard from *Maxxon* and seemingly be the first circuit court to adopt a strict tracing requirement.

Second, at least two circuits to consider appeals from equity-based disgorgement awards since *Liu* continue to rely on the reasonable approximation standard for purposes of calculating the disgorgement award. *See Fowler*, 6 F.4th at 267 ("In general, 'the amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation.'" (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013))); *U.S. Commodity Futures Trading Comm'n v. Tayeh*, 848 F. App'x 827, 828 (11th Cir. 2021) (unpublished) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment from ill-gotten gains and must not be used punitively. The CFTC has the burden to produce a reasonable approximation of a defendant's ill-gotten gains to sustain a disgorgement amount." (citation omitted)). And, post-*Liu*, numerous district courts across the country have continued to abide by the reasonable approximation standard, with some specifically rejecting a strict tracing requirement. *See SEC v. Owings Grp., LLC*, No. RDB-18-2046, 2021 WL 1909606, at *3, *5 (D. Md. May 12, 2021) (stating that "'a court's disgorgement calculation need only be a reasonable approximation of gains causally connected to the fraud'" and, while recognizing and discussing *Liu*, concluding "the SEC need not identify or trace the funds in each of the Defendants' possession" (quoting *SEC v. Resnick*, 604 F. Supp. 2d 773 782 (D. Md. 2009))); *SEC v. Skelley*, No. 18cv08803 (LGS) (DF), 2021 WL 863298, at *6 (S.D.N.Y. Feb. 25, 2021) (applying reasonable approximation standard and

stating, "the SEC 'is not required to trace every dollar of proceeds' or 'to identify misappropriated monies which have been commingled'" (quoting *SEC v. Anticevic*, No. 05 CV 6991 (KMW), 2010 WL 3239421, at *5 (S.D.N.Y. Aug. 16, 2010))); *SEC v. Voight*, No. H-15-2218, 2021 WL 5177779, at *1 (S.D. Tex. Feb. 3, 2021) ("[I]t is the SEC's burden in a remedies proceeding . . . to provide a 'reasonable approximation of profits causally connected to the violation' at issue. In addition, contrary to Defendants/Relief Defendants' argument, 'the SEC is not required to trace wrongfully-obtained funds to an identifiable *res* in the defendant's possession in order to obtain disgorgement.'" (quoting *SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551, at *3, *5 (N.D. Tex. Jan. 8, 2021))); *see also SEC v. Navellier & Assocs., Inc.*, No. 17-cv-11633-DJC, 2021 WL 5072975, at *2 (D. Mass. Sept. 21, 2021) ("The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation.'" (quoting *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004))). In the face of this voluminous authority, the dissent does not identify any pre- or post-*Liu* decisions, within the SEC disgorgement context, applying the strict tracing requirement for which the dissent advocates. While the dissent's position may well prevail one day, we opt not to stand alone on this matter.

With these cases in mind, we hold that the SEC was not required to trace ill-gotten investor funds taken by Sonya to specific accounts and property held by Paul and CLT when the SEC commenced this disgorgement action. Rather, the SEC only

needed to present evidence reasonably approximating the amount of ill-gotten funds

Paul and CLT received between August 23, 2012, and August 23, 2017.

### C.    *Application*

Having concluded the SEC need not trace the funds to particular property held

by a relief defendant but must establish, with reasonable approximation, the amount

of ill-gotten funds a relief defendant received, we now consider whether the SEC

offered sufficient evidence to sustain the disgorgement amounts against Paul and

CLT.

**1.    District Court's Disgorgement Order of $109,927.95 Against Paul**

We hold the district court's disgorgement order of $109,927.95 against Paul is

largely, but not entirely, sustainable. The evidence advanced by the SEC

demonstrates Paul received the following funds and benefits from CI: (1) $15,350.00

in checks; (2) $43,200.00 toward the loan on his Jeep Wrangler; (3) $34,017.26 in

payments from CI to his Amex account; (4) $6,161.39 in direct charges to CI's Amex

account; and (5) $11,178.70 in air travel where Paul was the ticketed passenger. *See*

App. Vol. III at 519a; Supp. App. at 103.

On appeal, Paul challenges the degree of tracing the SEC needed to

demonstrate and the ability of a district court to order disgorgement from his general

assets, issues resolved against Paul in the preceding section of this Order and

Judgment. But, on appeal, Paul neither asserts a direct challenge to the calculation of

these five figures nor argues that some portion of CI's funds were untainted. It is,

however, clearly apparent from the record that the five figures supporting the

disgorgement award against Paul add up to only $109,907.35, with the $20.60 difference attributable to a transcription error by Mr. Hennigan. *See supra* at pg. 13, n. 11. Accordingly, we reverse in part the district court's judgment as to Paul and remand for the district court to correct its judgment to reflect a disgorgement amount of $109,907.35 rather than $109,927.95.

**2.    District Court's Disgorgement Order of $865,000.00 Against CLT**

As outlined earlier, the SEC offered four different methods in support of the $865,000.00 disgorgement amount adopted by the district court. We discuss each method in turn, concluding that only one of the four methods provides a proper basis for establishing a disgorgement amount. Under the lone permissible method the SEC offered for establishing a disgorgement amount, the SEC, however, sustained its burden for an amount considerably less than the $865,000.00 ordered by the district court.

First, Mr. Hennigan and the SEC suggest CLT's disgorgement amount could be calculated by taking the amount of funds embezzled by Sonya during the five-year statute of limitations period and deducting from that amount the (1) money Sonya reimbursed investors, (2) money Paul received, and (3) money CI retained. But this approach merely establishes the amount of money the SEC cannot show another defendant or relief defendant retained or received. For instance, while it is possible CLT received all of the money the SEC could not otherwise account for under this method of calculation, it is also possible Sonya stashed some of the funds away in accounts not identified by the SEC, or she possibly used the money on personal

41

expenditures not detected by the SEC. Ultimately, the SEC must prove the amount of ill-gotten funds CLT received, *World Cap. Mkt., Inc.*, 864 F.3d at 1004, not merely the amount of money that the SEC cannot attribute to another recipient.

Second, the SEC argued at the remedies hearing that it could recover the value of CLT's assets because CLT indirectly benefited from Sonya's embezzlement, given that the embezzlement provided Sonya a larger pool of money to distribute to herself, Paul, and CLT. While the SEC's argument may be accurate from an intuitive perspective, this method of calculation is not capable of supporting a disgorgement award based in equity. This is because, to obtain an equity-based disgorgement award, the SEC needed to prove the amount of ill-gotten or tainted funds that CLT received, *see id.,* but this method of calculation lumps together tainted and untainted funds received by CLT. For instance, it does not provide a means of differentiating between Sonya transferring lawful salary and commission proceeds she received from LPL Financial to CLT from her transferring money she embezzled from investors to CLT. And by not differentiating tainted and untainted funds, the method runs afoul of the Supreme Court's warning against the imposition of joint and several liability in lieu of determining the amount of tainted money each defendant received, *see Liu*, 140 S. Ct. at 1945–46, because it effectively treats Sonya and CLT as a single entity for purposes of equitable disgorgement. In fact, when making its argument based on this method of calculation, the SEC admitted as much, saying that Sonya's conduct "enabled *other money* to go to buy these properties. So [CLT] is the

42

Camarcos. [CLT] is Sonya and Paul Camarco." App. Vol. II at 318a–19a (emphasis added).

Third, the SEC argued it could recover all of CLT's assets unless Paul could prove he had contributed to an asset. This appears to be the theory upon which the district court relied. But this method fails for three reasons. Initially, it shifts the burden of proving the tainted versus untainted nature of assets held by CLT from the SEC to Paul. Next, as with the second proposed method of calculation, it fails to distinguish between tainted and untainted funds. Paul's mere failure to contribute to an asset held by CLT does not equate to Sonya funding the asset with tainted funds because Sonya possessed some legitimate funds. Finally, even if Paul's inability to prove he contributed to an asset did equate to the asset being funded through tainted funds, it does not mean the value of the asset was subject to disgorgement in this proceeding. It is undisputed that Sonya engaged in her fraudulent activities for many years prior to the statute-of-limitations period in this disgorgement action. And three of the real properties at issue in this case were purchased prior to the statute-of-limitations period. *See* Opening Br. at 44 (arguing that district court "ordered Relief Defendants to sell properties that could not even in theory be traceable to Sonya Camarco's fraud because they were acquired years before the fraud began, including the home that Mr. Camarco resided in"). Yet, this third method does nothing to distinguish between assets purchased and supported with funds Sonya embezzled prior to August 2012 and assets purchased and supported with funds Sonya embezzled on or after August 23, 2012.

Fourth, and finally, Mr. Hennigan, during the remedies hearing, relied on several of the schedules he had prepared to assert CLT received $833,388.30 in tainted funds. *Id.* at 303a–12a. As a refresher, Mr. Hennigan relied upon five amounts to reach this figure: (1) $262,473.00 in transfers from CI's FirstBank account ending in 7119 to CLT's FirstBank account ending in 2491, *id.* at 303a; App. Vol. III at 539a–40a; (2) $149,000.00 in investor funds that supported the purchase of the 30562 Old Coast Road property, App. Vol. II at 306a–07a; *see also* App. Vol. III at 560a; (3) approximately $150,000.00 in investor funds that supported the purchase of the 106 Vale Street property, App. Vol. II at 308a–09a; *see also* App. Vol. III at 559a; (4) $65,000.00 based on the shortfalls between rental income and mortgage payments on the properties between August 2009 and August 2019, App. Vol. II at 309a–10a; *see also* App. Vol. III at 541a–58a; and (5) $206,915.30 in artwork, furnishings, and home improvement items, App. Vol. II at 311a–12a; *see also* App. Vol. III at 561a–64a.

This method of calculation advanced by Mr. Hennigan is the proper method for establishing a disgorgement award because it attempts to determine, with reasonable precision, the amount of tainted funds a relief defendant received. Unfortunately, though, for the SEC, it is apparent from the record that the schedules provided by Mr. Hennigan are not capable of supporting the district court's award of $865,000.00 against CLT. As an initial matter, the figure reached by Mr. Hennigan is more than $30,000.00 less than the award ordered by the district court. But the problems do not end there. Even focusing on the amounts Mr. Hennigan purported to

approximately trace, errors such as double-counting or failure to connect amounts to tainted funds, make several of his figures unsuitable bases for equitable disgorgement.

In Exhibit 10, Mr. Hennigan largely supported that CLT received $262,473.00 in transfers from CI. App. Vol. III at 539a–40a. But included in this amount was a $2,500.00 transfer on August 8, 2012, a date prior to the five-year statute-of-limitations period. *See id.* at 539a. Thus, for purposes of this proceeding, Exhibit 10 supports a disgorgement amount of $259,973.00 against CLT.

Mr. Hennigan, relying on Exhibit 23, next estimated that CLT received $149,000.00 in investor funds when Sonya put together the financing for CLT's purchase of the 30562 Old Coast Road property. But included in this figure was $52,573.00 in transfers from CI's FirstBank account ending in 7119 to CLT's FirstBank account ending in 2491. *See id.* at 560a. The five transfers making up the $52,573.00 were already accounted for in Exhibit 10 (that captured transfers from CI's account to CLT's account). *Compare id.*, *with id.* at 539a. Thus, to avoid double counting, $52,573.00 must be subtracted from $149,000.00, leaving $96,427.00.

Mr. Hennigan, relying on Exhibit 22, also asserted CLT received the benefit of approximately $150,000.00 in investor funds when Sonya purchased the 106 Vale Street property and then transferred title of the property to CLT. Included in this estimate was a $35,000.00 "Discover Loan." *Id.* at 559a. But the SEC did not offer any evidence that a loan from "Discover" was tainted investor funds. And the schedule reflecting Sonya's embezzlement of investor funds, Exhibit 7, does not

show any investors funds going toward a "Discover Loan" or, for that matter, any account name that included "Discover." *See id.* at 521a–26a. Nor have we located any evidence of CI paying Discover $35,000.00 to cover a loan. Thus, only $115,000.00 of this amount constitutes a reasonable approximation of ill-gotten funds.

Mr. Hennigan next relied on Exhibit 21 to assert that CLT benefited to the tune of $65,000.00 from shortfalls between mortgage payments on and rental income from real properties. There are two problems with this calculation. As an initial matter, the figure includes numerous transactions occurring before the statute-of-limitations period. *Id.* at 541a–45a. Thus, even if the shortfalls between mortgage payments and rental income accrued to the benefit of CLT, the figure reached in Exhibit 21 exceeds what the SEC may recover given the five-year limitations period. More fundamentally, however, where Sonya retained a significant amount of the rental income for her own accounts, and CLT paid more in mortgage payments than it received in rent, *see id.* at 558a, the shortfall between rental income received by CLT and mortgage payments made by CLT resulted in a monetary loss to CLT, not a gain of ill-gotten funds. Accordingly, Exhibit 21 does not provide any basis for supporting a disgorgement award.[24]

_____

[24] To the extent CLT used money it received from CI to cover the shortfalls, the money CLT received from CI is already captured by Exhibit 10. Further, where the rental properties did not net a profit, we agree with the dissent that the SEC's accounting-for-profits theory misses the mark and cannot support a disgorgement award under these facts. *See* Dissent Slip Op. at 6–7.

Finally, Mr. Hennigan's $833,388.30 figure included $206,915.30 in artwork, furnishings, and home improvement items. Yet, the district court, although seemingly agreeing during the remedies hearing that the artwork belonged to CLT, imposed the $865,000.00 disgorgement amount, in addition to the any proceeds from the sale of the artwork, rather than crediting any sale proceeds toward the $865,000.00 amount.

In sum, reducing the $833,388.30 figure based on the above analysis ($2,500.00 for the pre-statute-of-limitation transfer in Exhibit 10, $52,573.00 for double-counting on Exhibit 23, $35,000.00 for the loan on Exhibit 22, and $65,000.00 for Exhibit 21 not establishing that CLT received any benefit), the SEC presented evidence supporting a disgorgement award of $678,315.30. And this amount is *inclusive* of the artwork, furnishings, and home improvement items such that proceeds from the sale of these items should be counted *toward* CLT's disgorgement amount.[25] Accordingly, we reverse the district court's disgorgement award as to CLT and remand for entry of a modified order consistent with the evidence presented by the SEC and our calculations.[26]

---

[25] We do not include the piano in the artwork and furnishings because CLT does not make any argument about the piano, and it is not apparent from the record that Exhibit 25, which details the purchases of artwork and furnishings, includes the piano. Accordingly, any proceeds from the sale of the piano shall not count toward CLT's disgorgement amount.

There is no evidence in the record as to what artwork or furnishings have been sold, or for what amounts, because these sales would have occurred after the district court's order. Therefore, we leave to the district court to calculate the amount that should be credited to CLT for those sales.

[26] The dissent contends we "reverse sua sponte" in "the absence of any prior mention of a calculation error." Dissent Slip Op. at 19. We view the record

47

### D.    LPL Financial as Potential Recipient of Disgorged Money

As a final matter, Paul and CLT argue the district court erred in designating

LPL Financial a victim eligible to receive disgorged monies. The pertinent statutory

language permits for "equitable relief that may be *appropriate* or necessary *for the*

*benefit of* investors." 15 U.S.C. § 78u(d)(5) (emphasis added). If the statutory

language allowed only for equitable relief that was necessary for investors, Paul and

CLT would have a strong argument. But the statutory language is more flexible when

describing when a court may order equitable relief. By allowing relief when

"appropriate . . . for the benefit of investors" rather than just "for investors," the

statute grants district courts leeway in formulating awards that may provide

secondary benefits to investors rather than only direct benefits to investors. And

---

differently than our dissenting colleague. During the evidentiary hearing, counsel for
CLT and Paul specifically cross-examined Mr. Hennigan about the very schedules
and calculations upon which we rely to reach the disgorgement award we are able to
alternatively affirm in part. App. Vol. II at 303a–12a. Further, in their briefing to the
district court, CLT and Paul raised some of the calculation errors, statute of
limitations concerns, and double counting concerns underlying our modification of
the district court's award. App. Vol. III at 510a–11a. Thus, the SEC had an
opportunity to address the issues underlying our modification of the disgorgement
award. And we see no reason to permit the SEC a second bite at the apple to present
evidence in support of a disgorgement award. Rather, where, as here, the record was
developed below and the errors are apparent on the face of the record, principles of
judicial economy favor affirming in part and reversing in part on an alternative
ground. This is particularly true where the SEC initiated this disgorgement action
over four years ago to recoup funds Sonya embezzled up to nine years ago. A remand
for the district court to perform calculations on a record the parties have already had
ample opportunity to perfect would only serve to further delay the ability of investors
to recover funds and would not serve the best interest of the investors. Finally, our
case law permits us to affirm on an alternative ground that clearly appears in the
record even where the parties do not brief that ground in this court. *Jordan v. U.S.
Dep't of Justice*, 668 F.3d 1188, 1200 (10th Cir. 2011).

allowing an investment firm to recover money equal to the reimbursements it provided investors confers a secondary benefit upon investors, as a class, because it incentivizes investment firms to reimburse investors in the wake of a financial advisor embezzling investor funds. Furthermore, if the disgorged monies exceed the amount of money embezzled by Sonya minus the reimbursements already received by investors, the alternative options for disbursement of the money—depositing the money in the U.S. Treasury or permitting Paul, CLT, CI, or Sonya to retain the money—would provide no benefit, direct or secondary, to investors. Accordingly, we affirm the district court's decision to designate LPL Financial as a victim eligible to recover disgorged monies.

### III.    CONCLUSION

We AFFIRM to the extent the district court held that disgorgement is an equitable remedy available to the SEC, that nothing required the SEC to strictly trace money embezzled by Sonya to funds or assets held by Paul and CLT at the commencement of the disgorgement action, and that LPL Financial is eligible to receive disgorged funds. We, however, REVERSE the district court's calculation of the disgorgement amounts against Paul and CLT because the evidence presented by the SEC is not capable of establishing that Paul and CLT received an amount of ill-gotten funds equal to the awards. Finally, we REMAND to the district court for it to enter a modified order reflecting a disgorgement amount of $109,907.35 against Paul

and a disgorgement amount of $678,315.30 against CLT, with proceeds of the sale of

any artwork and furnishings credited toward CLT's disgorgement amount.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

*SEC v. Camarco*, No. 19-1486
**BACHARACH**, J., dissenting

In my view, the district court erroneously ordered equitable disgorgement without tracing the defendants' assets to the victims. The majority concludes that tracing is unnecessary and reverses sua sponte based on errors in the district court's calculations of the amount to be disgorged. In my view, the majority errs by

- relieving the SEC of the need for tracing and

- reversing sua sponte based on its own calculations of the proper amount to be disgorged.

**Tracing**

1.    **To obtain equitable disgorgement, the SEC needed to trace the investors' money to assets held by Mr. Camarco and the Trust**.

The SEC sued for equitable disgorgement under 15 U.S.C. § 78u(d)(5). This statute provides that in cases involving the securities laws, the SEC may obtain "equitable relief that may be appropriate or necessary for the benefit of investors." *Id.*

Under this statute, a claimant may obtain equitable remedies only if they "fall[] 'into those categories of relief that were typically available in equity.'" *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)). To determine whether relief was typically available in equity, we can consult works on equity jurisprudence. *Id.*

Relying on works of equity jurisprudence, the Supreme Court has concluded that equitable claims for restitution "generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002); *see also Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1225 (10th Cir. 2019) (adopting *Knudson*). And disgorgement is a form of restitution. *Kokesh v SEC*, 137 S. Ct. 1635, 1640 (2017). So disgorgement was typically available in equity only "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Knudson*, 534 U.S. at 213 (citing 1 Dan Dobbs, *Law of Remedies* § 4.3(1) (2d ed. 1993); Restatement (First) of Restitution § 160 cmt. a (Am. L. Inst. 1937); and 1 George E. Palmer, *Law of Restitution* § 1.4, 3.7 (1978)).

Even when money has been traced, it is sometimes used for consumable items (like food) or experience (like travel). In these situations, dissipation of the money typically prevented disgorgement in equity. *Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 144–45 (2016). So when a traceable fund has been dissipated, the only available remedy is *legal* restitution. *Id.*; *see Knudson*, 534 U.S. at 213–14 (noting that when "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains,

2

[the plaintiff's] claim is only that of a general creditor," not restitution in equity (alteration in original) (quoting Restatement (First) of Restitution § 215 cmt. a (Am. L. Inst. 1937))); *see also* Candace Saari Kovacic-Fleisher, *Restitution in Public Concern Cases*, 36 Loy. L.A. L. Rev. 901, 912–13 (2003) (noting "the often-stated requirement of tracing in suits in equity when seeking disgorgement of gain" and observing that "[t]he lack of tracing . . . would not preclude an action in legal restitution for the value of potential gain, rather than an equitable order to convey the gain"); Michael Scott, *The Right To "Trace" at Common Law*, 7 U.W. Austl. L. Rev. 463, 479 (1966) ("[T]he common law right of action can thus survive the loss or destruction of the res, while the equitable right of action depends upon its continued possession by the defendant.").

The SEC contends that "[w]here Congress wants to limit a statute to property that 'remains in the possession' of a person as the filing date of a particular action, it does so expressly." Appellee's Surreply Br. at 3. But our statute did expressly limit the remedy to "equitable relief," and the Supreme Court has already held that equity typically limited disgorgement to assets remaining in the defendant's possession. *See* pp. 1–2, above.

The majority also points out that before 2020, some other circuit courts had permitted the SEC to recoup assets without tracing. Maj. Op. at 35–36. But after issuance of these opinions, the Supreme Court decided *Liu v. SEC*, which expressly limited the remedies in § 78u(d)(5) to those

3

"typically available in equity." 140 S. Ct. 1936, 1942 (2020). And in equity, relief typically required tracing. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002). The majority does not reconcile those pre–2020 opinions with *Liu*.

**2.    The tracing requirements are not limited to ERISA claims.**

In defending the district court's award of equitable disgorgement, the SEC limits the tracing requirements to ERISA claims. Appellee's Resp. Br. at 44–47. ERISA authorizes "appropriate equitable relief," 29 U.S.C. § 1132(a)(3)(B), and courts apply traditional rules of equity when determining the availability of relief under ERISA. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (disallowing the requested remedy because it was neither typically available in equity nor traditionally viewed as equitable).

Our statutory language resembles ERISA's, allowing "equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Given the similarity in the statutory language, the Supreme Court has applied its ERISA precedents to cases involving § 78u(d)(5), restricting relief to remedies that were typically available in equity. *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020) (quoting *Mertens*, 508 U.S. at 256). We thus face the same issue that arises under ERISA: is the requested remedy one that was typically available in equity?

4

Despite the similar statutory language and interpretations by the Supreme Court, the SEC points to three differences with ERISA cases:

1.  In ERISA cases, the plaintiffs are private parties bearing preexisting contracts with the wrongdoers; the SEC is a public entity with no pertinent contracts.

2.  Restitution under ERISA goes to the plaintiff, but the SEC collects disgorged funds for eventual distribution to victims.

3.  The SEC acts in the public interest, and ERISA plaintiffs act in their own interests.

Appellee's Resp. Br. at 45–46. Given these differences, the SEC insists that ERISA's tracing requirements don't apply. *Id.* at 44. In my view, however, these differences do not undermine the need for tracing when applying § 78u(d)(5).

Despite the differences between the SEC and plaintiffs in ERISA cases, four similarities exist:

1.  The SEC's claim is equitable (just like claims under ERISA). *See* p. 1, above.

2.  The applicable statute (15 U.S.C. § 78u(d)(5)) allows remedies only if they were typically available in equity. *See* p. 1, above.

3.  Works on equity jurisprudence inform us about the availability of equitable relief (irrespective of whether the underlying statute is § 78u(d)(5) or ERISA). *See* p. 1, above.

4.  Works on equity jurisprudence allow recoupment from the defendant's assets only if they are traceable to victims of the fraud (irrespective of whether the recoupment arises under § 78u(d)(5) or ERISA). *See* p. 2, above.

5

Given these similarities, we should treat the same statutory term ("equitable relief") the same when interpreting ERISA and § 78u(d)(5).

### 3. The accounting-for-profits theory does not apply because no profit-generating *res* exists.

The SEC relies in part on a theory of accounting for profits, which does not require tracing. Appellee's Resp. Br. at 46–47 (quoting *Great-West Life & Annuity Ins. Co. v Knudson*, 534 U.S. 204, 214 & n.2 (2002)). But this reliance stems from misapplication of this theory.

An accounting for profits is available only if the plaintiff shows "entitlement 'to a constructive trust on particular property held by the defendant' that the defendant used to generate the profits." *Teets v Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1226 (10th Cir. 2019) (quoting *Knudson*, 534 U.S. at 214 n.2). If the plaintiff can point to a profit-generating *res* held by the defendant, the plaintiff would not need to trace the profits. *Id.* at 1225–26. But absent a particular profit-generating *res*, an order for payment out of the defendant's general assets would constitute legal relief—not equitable accounting or disgorgement of profits. *See id.* at 1226 ("[W]ithout a particular profit-generating *res*, a claim for payment out of the defendant's general assets is a request for legal relief rather than an equitable accounting or disgorgement of profits."); *see also Knudson*, 534 U.S. at 214 (characterizing an award of

6

restitution as legal, rather than equitable, because the ill-gotten asset was no longer in the defendant's possession).

The SEC doesn't identify a profit-generating *res* that is held by Mr. Camarco or the Trust. *See* Appellee's Resp. Br at 46–47. Without such a *res*, the theory of an accounting for profits does not apply.[1]

The SEC contends that in *Liu v. SEC*, the Supreme Court identified the disgorgement claim as a type of "accounting for profits." *Id.* at 47 (quoting *Liu*, 140 S. Ct. at 1942–44). The SEC has misinterpreted *Liu*. There the Supreme Court concluded that disgorgement was a remedy "typically available in equity." 140 S. Ct. at 1946. For this conclusion, the SEC compared disgorgement to other forms of equitable relief, such as an accounting for profits, and inferred inequity when wrongdoers profit from their own misconduct. *Id.* at 1942–46. The Court never suggested that an accounting for profits was itself a form of disgorgement.

4.    **The majority errs by relying on our precedent allowing a reasonable approximation when granting an accounting for profits.**

In jettisoning a requirement for tracing, the majority relies largely on *SEC v. Maxxon, Inc*, where we upheld an award of profits based on a

---

[1]    The majority agrees that an accounting for profits is unavailable here because the SEC didn't show a profit from the rental properties. Maj. Op. at 46 n.24 ("[W]here the rental properties did not net a profit, we agree with the dissent that the SEC's accounting-for-profits theory misses the mark and cannot support a disgorgement award under these facts.").

7

reasonable approximation. 465 F.3d 1174 (10th Cir. 2006). This reliance is misguided because *Maxxon* didn't address tracing and relied on a theory (accounting for profits) that doesn't apply here.

In the appellate briefs and opinion in *Maxxon*, the term "tracing" is never mentioned. We can't rely on *Maxxon* for a proposition that wasn't ever mentioned in either the opinion or appellate briefs. *See United States v. Harrison*, 296 F.3d 994, 1005 (10th Cir. 2002) ("[A] prior opinion cannot stand as precedent for a proposition of law not explored in the opinion, even when the facts stated in the opinion would support consideration of the proposition.").

The omission isn't surprising because *Maxxon* addressed an accounting for profits. There a corporate insider sold stock for an inflated price by misrepresenting facts about the company's product. *Maxxon*, 465 F.3d at 1175–78. The district court ordered disgorgement of the corporate insider's profits (not recoupment of items bought with stolen funds). *Id.* at 1178 & n.8. So there wasn't—and couldn't be—an issue of tracing. *See Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1228–29 (10th Cir. 2019) (concluding that the failure to trace property to a profit-generating *res* prevented equitable recovery as an accounting for profits).

As discussed above, an accounting for profits is available only when there's a profit-generating *res*. *See* Part 3, above. And no such *res* exists

8

here. The majority thus errs by rejecting a requirement for tracing based on a precedent that had nothing to do with tracing.[2]

## 5.     Public policy does not justify the disgorgement award.

The SEC also argues that if we require tracing, Mr. Camarco and the Trust could avoid disgorgement by spending the fraudulent proceeds on themselves. Appellee's Resp. Br. at 51–52. The SEC labels this possibility "monstrous" because it would "perpetuate rather than correct an inequity." *Id.* at 51 (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000)); *see also* Maj. Op. at 34 ("[A] savvy embezzler could quickly spend the money on luxury vacations, secrete ill-gotten funds away in a location or foreign bank account not detectable by authorities, or so commingle tainted funds with untainted funds as to make it impossible to trace the tainted funds to their final resting place.").

This argument disregards the language of 15 U.S.C. § 78u(d)(5) and the analysis in *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020). Under § 78u(d)(5), the plaintiff may recover only "those categories of relief that

---

[2]     The majority also relies on a published opinion in the Sixth Circuit and an unpublished per curiam opinion in the Eleventh Circuit: *SEC v. Fowler*, 6 F.4th 255 (2d Cir. 2021) and *U.S. Commodity Futures Trading Comm'n v. Tayeh*, 848 F. App'x 827, 828 (11th Cir. 2021) (per curiam). But both of these opinions also involved accounting for profits, allowing reasonable approximation of profits made from a profit-generating *res*. *Fowler*, 6 F.4th at 267; *Tayeh*, 848 F. App'x at 829–30. As discussed in the text, an accounting for profits requires the existence of a profit-generating *res*. *See* Part 3, above.

were typically available in equity." *Liu*, 140 S. Ct. at 1942. Here the district court awarded relief not typically available in equity: disgorgement to a plaintiff who had not traced the victims' money to the defendants' current assets.

We are constrained by the statute regardless of our own views on a just outcome. But even without this constraint, the tracing requirement doesn't necessarily perpetuate an inequity. The wrongdoer was Ms. Camarco, who already must disgorge her own assets. Though Ms. Camarco is no doubt culpable, the SEC has not tried to pin blame on Mr. Camarco or the Trust. For example, the SEC observes that Mr. Camarco and the Trust "did not violate the securities laws" and have "'not [been] accused of wrongdoing.'" Appellee's Resp. Br. at 23 (quoting *SEC v. Erwin*, No. 13-cv-3363, 2020 WL 7310583 (D. Colo. Dec. 11, 2020)).[3]

Perhaps reasonable individuals might view it as unfair to require tracing. But we must apply the statute that Congress enacted, as interpreted by the Supreme Court. And the Supreme Court has limited the statutory remedy to the relief typically available in equity. *See* Parts 1–2, above. That relief traditionally required tracing. So if we're to apply the statute as written, tracing is required.

---

[3]    Even so, the district court commented that "[i]t is hard to believe" that Mr. Camarco had been "completely unaware" of his wife's fraud. Appellants' App'x vol. 3, at 592.

**6.    Recent amendments to 15 U.S.C. § 78u(d) do not relax the applicable rules on equitable tracing.**

In 2021, Congress amended 15 U.S.C. § 78u(d) to expressly authorize disgorgement. National Defense Authorization Act for Fiscal Year 2021 (the 2021 NDAA), Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4625–26. The amendments apply to any act or proceeding that was pending on the date of enactment (January 3, 2021). The new provisions

- allow district courts to "require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation [of the securities laws]" (15 U.S.C. § 78u(d)(3)(A)(ii)),

- expressly authorize disgorgement (15 U.S.C. § 78u(d)(7)), and

- create limitations periods for "disgorgement" and "any equitable remedy" (15 U.S.C. § 78u(d)(8)).

The SEC asserts that the amendments merely confirmed its interpretation of the earlier version of 15 U.S.C. § 78u(d). *See* Appellee's Surreply Br. at 2–6. So the SEC admits that the new subsection expressly authorizes "disgorgement" as a form of "equitable relief." 15 U.S.C. § 78u(d)(5), (7)–(8).

The SEC's statutory interpretation matches its characterization of the disgorgement remedy. Throughout these proceedings, the SEC has sought "equitable disgorgement," not restitution available at law. *See* Appellants' App'x vol. 1, at 19–20 (seeking "equitable disgorgement" in the Second Amended Complaint); *id.* at 41 (stating that "[d]isgorgement is by nature

11

an equitable remedy" (quoting *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006))); *id.* at 113 (arguing that "the relief sought against movants is equitable relief").

I would follow the SEC's characterization of its claim. Despite the statutory amendments, the SEC sought equitable relief. That relief requires tracing.

**7.    The SEC didn't trace the investors' money to funds or property held by Mr. Camarco and the Trust.**

The SEC did not trace the investors' money to existing assets of Mr. Camarco or the Trust.

For the claim against Mr. Camarco, the SEC sought $109,927.95 based on

- checks from Camarco Investments[4] to Mr. Camarco in 2014 and 2016,

- Mr. Camarco's Jeep loan, which Camarco Investments paid off in 2016,

- payments by Camarco Investments on Mr. Camarco's credit card from 2012 to 2017,

- charges by Mr. Camarco on Camarco Investments' credit card from 2012 to 2017, and

- charges for Mr. Camarco's flights during that period.

Appellants' App'x vol. 3, at 519.[5]

_____

[4]    Ms. Camarco created Camarco Investments to hold investors' funds.

[5]    According to the SEC, Mr. Camarco conceded that disgorgement of these funds would be "ethical and fair." Appellee's Resp. Br. at 50

12

Some of this money can no longer be traced to funds or property held by Mr. Camarco. For example, the SEC concedes that Mr. Camarco no longer has the money spent on airfare and credit-card charges, totaling roughly $56,000. Appellee's Resp. Br. at 50. But if Mr. Camarco no longer has the asset, the SEC's remedy is legal—not equitable. *See Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 145 (2016) (concluding that recovery out of "[a] defendant's expenditure of the entire identifiable fund on nontraceable items (like food or travel) . . . is a legal remedy, not an equitable one"); *see also In re Brazile*, 993 F.3d 593, 595 (8th Cir. 2021) (per curiam) (stating that the government's remedy is at least partially legal, not equitable, when the remedy involves "a money judgment" that accounts "for funds that are not traceable to a particular transfer, but have been dissipated or commingled with other funds"); *Akers v. Md. State Educ. Ass'n*, 990 F.3d 375, 381 (4th Cir. 2021) ("[W]here a plaintiff seeks 'recovery from the beneficiaries' assets generally' because her specific property has dissipated or is otherwise no longer traceable, the claim 'is a legal remedy, not an equitable one.'" (quoting *Montanile*, 577 U.S. at 144–45)).

---

(quoting Appellants' App'x vol. 2, at 449 & vol. 3, at 592–93). But the issue involves consideration of the remedies traditionally available in equity, not a Solomonic inquiry into what's "ethical" or "fair" in a moral sense. On our legal issues, Mr. Camarco has consistently urged a need for tracing.

13

The SEC may still be able to trace some of the investors' money to funds used to pay for Mr. Camarco's Jeep and deposited in accounts that Mr. Camarco still owned at the start of the action. Appellee's Resp. Br. at 50. But in district court, the SEC did not trace the investors' money to the Jeep or to Mr. Camarco's accounts.

For its claim against the Trust, the SEC sought $865,000 by adding

- the money made from the sale of three rental properties,

- the estimated equity in a fourth rental property,

- half of the equity in the Camarcos' residence, and

- money held in other bank accounts.

Appellants' App'x vol. 3, at 593. But the SEC did not trace these assets to the investors' money. The Camarcos had bought the residence and two of the rental properties before the relevant period (2012 to 2017). Appellants' App'x vol. 1, at 36–37. The SEC did show that the Camarcos had used some of the investors' money to buy and maintain two other rentals. *Id.* at 37. But the SEC did not show how much of the trust's assets had come from Ms. Camarco's fraudulent scheme.

**8.    The rules for commingled accounts do not support the disgorgement award.**

The SEC cites the principle that "[i]n equity jurisprudence generally, it is sufficient to trace ill-gotten gains to a commingled account." Appellee's Resp. Br. at 49. Under this principle, "[t]he person whose

14

money is wrongfully mingled with money of the wrongdoer does not thereby lose his interest in the money, . . . but he acquires an interest in the mingled fund." *Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1226 (10th Cir. 2019) (quoting Restatement (First) of Restitution § 209 cmt. a (Am. L. Inst. 1937)).

Some evidence suggested that Ms. Camarco had commingled the investors' money with the money in other accounts. Given this commingling of funds, the SEC maintains that it proved Ms. Camarco's fraud against investors, placement of their money in various accounts, and use of those accounts to pay for the rental properties and the family residence.

I disagree for two reasons.

First, if the Camarcos had "dissipated the entire fund on nontraceable items, that complete dissipation eliminated the [equitable] lien." *Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 145 (2016); *see also Teets*, 921 F.3d at 1226 ("If a defendant disposes of all of the particular property that allegedly should belong to the plaintiff under equitable principles, the plaintiff no longer has a specifically identifiable *res*."). Here an equitable lien disappeared when the funds were dissipated on consumable items and experiences. *See* Appellants' App'x vol. 3, at 592.

15

Second, even for the funds and property still held by Mr. Camarco and the Trust, the SEC didn't identify the amounts attributable to the investors' funds. Reviewing the SEC's evidence, the district court acknowledged its inability to "determine from evidence in the record the precise amount of misappropriated funds or derived from misappropriated funds that [had been] transferred into the Trust." *Id.* at 593.

The SEC argues that even if the commingling had prevented tracing, restitution would be available. For this argument, the SEC points to the First Restatement of Restitution. Appellee's Resp. Br. at 49, 51. But the First Restatement addresses both legal and equitable restitution. *See* Restatement (First) of Restitution, Introduction (Am. L. Inst. 1937) ("The Restatement of the Law of Restitution as here presented treats as one coherent subject principles, rules, and remedies applicable to restitution as they have been developed *through actions at law and proceedings in equity*.") (emphasis added).[6] So the availability of restitution in the First Restatement sheds no light on the remedy's status as legal or equitable.

So even though Mr. Camarco and the Trust had held commingled funds that included the investors' money, the SEC didn't establish a right to recover a specific amount in equitable disgorgement.

---

[6]     The most recent Restatement explains that "[l]iabilities and remedies within the law of restitution and unjust enrichment may have originated *in law, in equity, or in a combination of the two*." Restatement (Third) of Restitution and Unjust Enrichment § 4 (2010) (emphasis added).

### Sua Sponte Analysis of the Amount
### of the Restitution Amount

The majority decides sua sponte that the district court's restitution award should be reduced by $189,705.30. But Mr. Camarco and the Trust raised none of the errors identified by the majority.

In considering whether to reverse, we generally confine ourselves to the grounds presented by the appellants. *United States v. Tee*, 881 F.3d 1258, 1269 (10th Cir. 2018). Despite this general practice, we might spot errors not identified by Mr. Camarco or the Trust. But we generally rely on the parties to frame the issues, acting only on the matters that have been presented. *Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008).

We've deviated from this practice only in exceptional circumstances. *Tee*, 881 F.3d at 1269. Even when the circumstances are exceptional, we've never reversed sua sponte without letting the parties brief the matters that we've flagged. *Id.* (quoting *Margheim v. Buljko*, 855 F.3d 1077, 1088–89 (10th Cir. 2017)); *cf. Planned Parenthood of Kan. & Mid-Mo.*, 747 F.3d 814, 836–38 (10th Cir. 2014) (addressing an issue sua sponte when the plaintiff had raised the issue in the opening brief but had not pressed the point in further briefing, reasoning that the issue was crucial and the defendant had had opportunities to respond).

In explaining its departure from this established practice, the majority states that

17

- we can affirm on alternative grounds and

- Mr. Camarco and the Trust raised these issues in district court.

*See* Maj. Op at 47–48 n.26.

Granted, we can affirm on alternative grounds. *See, e.g.*, *Richison v. Ernest Grp.*, 634 F.3d 1123, 1130 (10th Cir. 2011). For example, if the district court entered the right disposition for a different reason, we could affirm on an alternative ground. *See Jennings v. Stephens*, 574 U.S. 271, 276 (2015). But the majority hasn't affirmed the district court's judgment. That judgment awarded the SEC $109,927.95 against Mr. Camarco and $865,000 against the Trust. An affirmance would confirm these awards, as the term "affirm" means "[t]o confirm (a judgment) on appeal." *Affirm*, Black's Law Dictionary 67 (Bryan A. Garner ed.-in-chief, 9th ed. 2009). Rather than confirm the SEC's judgment, the majority has cut it by a total of $189,705.30.[7] This slicing of the award is a *reversal*, not an *affirmance*. To date, neither we nor any other circuit court has purported to affirm a judgment for the plaintiff by reducing it.[8]

---

[7]    The majority appears to acknowledge that this part of the opinion involves a reversal rather than an affirmance: "Rather, where, as here, the record was developed below and the errors are apparent on the face of the record, principles of judicial economy favor affirming in part and *reversing in part on an alternative ground*." Maj. Op. at 47–48 n.26 (emphasis added).

[8]    The majority cites one example where the Second Circuit Court of Appeals cut an award to the SEC: *SEC v. Fowler*, 6 F.4th 255 (2d Cir. 2021). There the SEC conceded a calculation error, and the Court of

18

Even if the majority could sua sponte reduce the award, shouldn't we at least allow the SEC to address the issue first? As the majority notes, the parties did address some of these issues in district court. Maj. Op. at 47–48 n.26. But the SEC prevailed there. Mr. Camarco and the Trust appealed, but didn't raise these issues on appeal. So the SEC had no reason to address these issues here.

I see no basis for the majority's decision to *sua sponte* reverse the SEC's award, reducing it by $189,705.30 based on issues never mentioned by anyone on appeal until the issuance of this opinion.

*\*\*\**

The circumstances here aren't exceptional, and we've not given the parties an opportunity to address the errors identified by the majority. Given the absence of any prior mention of a calculation error, I would not reverse sua sponte on this basis. I would instead address only the arguments presented by the parties.

---

Appeals agreed. *Id.* at 267. So the Court of Appeals first "modif[ied] the judgment to correct [the] error in the amount of the judgment." *Id.* at 258 The Court of Appeals *then* affirmed. *Id.* ("*After modifying* the judgment to correct one error in the amount of disgorgement, we affirm." (emphasis added)). The Second Circuit didn't purport to affirm the judgment by cutting the award.

19

**Disposition**

The district court granted equitable disgorgement without tracing the investors' money to the current assets of Mr. Camarco or the Trust. So we should vacate the award.

The SEC may still be able to trace at least some of the investors' money to funds and property held by Mr. Camarco and the Trust. So with our vacatur of the award, we should instruct the district court to restrict relief to assets that are traceable to money fraudulently taken from the investors.[9]

---

[9]    Mr. Camarco and the Trust also challenge the right of Ms. Camarco's former employer (LPL Financial) to share in any award. Appellants' Opening Br. at 45–46. The majority concludes that the former employer should share in the award. Maj. Op. at 48–49. In my view, however, this issue is premature until the district court decides whether any of the investors' money can be traced to assets owned by Mr. Camarco or the Trust.

20